## BEBEE *vs.* THE HARTFORD COUNTY MUTUAL FIRE INSURANCE COMPANY.

Where a local agent of a fire insurance company, authorized to receive and forward to the company applications for insurance, and instructed by the company to consider himself in so doing, the agent of the party applying rather than of the company, neglects to communicate to the company facts disclosed to him by an applicant for insurance, material to the risk, and the company in consequence issues a policy in ignorance of such facts,—the neglect of such agent is not chargeable to such applicant, unless such agent be also acting as the agent of the applicant : and the instructions of the company above stated, not communicated to the applicant, do not make him such agent.

An applicant for insurance is bound to disclose fairly and with entire frankness, all facts known to him, which are material to the risk, and the neglect to do so, even though by inadvertence and without actual fraud, will vitiate the policy.

But the application of this rule does not require him, after making a general statement of such facts, to go into details about which the insurer manifests no interest and makes no inquiry.

Where, on a motion for a new trial for a verdict against evidence in an action on a fire insurance policy, it appeared, that before the insurance was effected, fires had repeatedly occurred in the buildings insured, and that the plaintiff in applying for insurance omitted to state the precise number of fires, which had so occurred, but from the whole evidence it did not appear that there was any neglect to communicate material facts, and especially no intentional concealment on his part; it was held, that such motion ought not to be granted.

THIS action was brought by appeal from the county court to the superior court for New London county, and was tried at the term of the latter court holden in January, 1856.

The plaintiff, in his declaration, claimed to recover of the defendants the sum of $1,475, upon their policy of insurance dated November 5th, 1856, for the loss of a dwelling-house and barn. The defendants pleaded the general issue, with a notice setting forth that at the time the plaintiff applied for and obtained said policy of insurance, the premises were exposed to the hazard of incendiarism, and that fires had repeatedly occurred therein just before that time, all which was well known to the plaintiff, and was not disclosed to the defendants, and that the plaintiff in obtaining said insurance suppressed facts which were known to him and were material to the risk.

On the trial the plaintiff gave in evidence,

1. His own testimony to the following facts.

On the second day of November, 1854, on entering his wood-house early in the evening, he discovered fire in a barrel of shavings. He extinguished the fire, supposing at the time, that it was the result of accident. The next day at about 3 o'clock in the afternoon, fire was discovered in the attic of this wood-house, and in the attic of an addition to the dwelling-house, connected with the wood-house, and burning at the same time on each side of a rough board partition which separated these rooms. As soon as these fires were extinguished, another fire was discovered in a front chamber of the house, which was subdued, after a bed

in which it had apparently been kindled, had been nearly destroyed.

The plaintiff then proceeded to testify as follows:

" On the morning of the fourth of November, I went to Oliver I. Lay, the defendants' agent, to get insured. I had never been to him before to get insured. I found him at home and spoke to him about insuring my buildings. He had before this proposed it to me. I said I had had some fires in my wood-house and house, and wanted my buildings insured. I can't state the details of conversation at that time. He inquired the size of the buildings and distances apart. I told him I could not then give them to him. He said he was going to Hartford and New York, and wanted me to get the dimensions of my buildings and bring the same to him before he left. I said I would come to-morrow, Saturday. He said, " You'll come while the fire is hot." I went home, and on that day, Friday, made measurements and drew plans, and went to Lay's again Saturday morning, reaching there about 10 o'clock. There had been no new fires at that time. I showed to him the plans of my buildings, distances, &c., and then stated to him about the fires— telling him that I had had fires in the wood-house and house—told him that the first fire was discovered in the wood-house in a barrel of shavings, and told him how we put it out. Just then he interrupted me, and asked where the fire was in the main part of the house; and I told him in the bed, in the west front chamber; and he asked me how much the bed was damaged, and I replied that it was about spoiled. He asked me no more questions about the fires. He then asked me if I had any enemy that I thought would do it, or had suspicion of any one, and I told him in reply that I could not tell him anything about it, only that these fires had occurred, I could not tell how; that it was all a mystery; and he remarked in answer, he had been frequently afraid his house would get burned, for fires frequently occurred, and no one could tell how they occurred. I asked Lay then about slow matches, how they could be set, and how long before they would go off; and he said I had been

captain of the old artillery company, and knew as much about slow matches as he did, and thus ended the match talk. Lay then asked me who had been at my house, and wanted to know if any one had been there that I should suspect of setting fire to the premises. I said my brother-in-law and an old Englishman named Richardson, but I did not suspect either of them. I told him I did not suspect any one. He asked me again if I had any enemy who could do it, and I replied that I knew of none.

We then talked about rates of insurance. The application was filled and I signed it. I asked Lay if I should pay then or when I got my policy, and he said if I wanted it to take effect then I must pay then, and it would take effect at noon. I am confident I told Lay, both times that I was there before being insured, that I had had fires. I don't remember that I told him that I had watched the house."

2. The plaintiff then offered as a witness Oliver I. Lay, who testified as follows:

" Bebee called on me on Friday, and said he wanted insurance on his house and other buildings, and the property they contained. I told him it would be necessary for one of us to make plans, surveys, &c. He came again on Saturday, and brought his plans and measurements, and we sat down, and application was made as usual. He signed the application, and asked when the insurance would take effect, and I said on this day, if he paid. By the rules of the company, the doings of an agent are not binding on them as to rates, so I had him leave more money than I had fixed on as rates. He paid me, I think, $12. I remember his asking me about slow matches, and their operation, and about other matches, and if they would ignite if placed between beds. He told me he had some fires in the back part or rear room of his house in shavings; had been making additions, and found shavings on fire; and that he had found a bed on fire also, in a front chamber in another part of his house, which was mostly destroyed. I then asked him the circumstances about the fires, if he knew how they originated. He said that he did not. I then asked him if he had any enemies

who he thought would burn him up. He said he did not know as he had any. I asked him if he had any suspicious persons about, and who had stopped there. He said there had been no one; that his brother-in-law and an old Englishman were the only ones who had been there. I don't remember his particularly stating how much of the bed and bedding was consumed. He said that these fires were very mysterious, and that he could not account for their origin. I am not perfectly confident which time he stated about the fires, but think it was at the time he signed the application. I told him on Friday, that as I was to be absent on the following week, I preferred that he should attend to the matter on Saturday, as I could not attend to it after that, for a week."

On re-examination, Lay said, "The officers of the company had told me that I must consider myself more the agent of the party insured than the company's, as they (the company) kept the keys, and ratified whatever I did."

The defendants offered in evidence, 1. the testimony of Ebenezer Mack, which was as follows:

"I lived one and a half miles from Bebee's house at the time it was burned. I came past Bebee's two or three days before his house was burned. Bebee spoke to me, and said, "Mack, I have been on fire to-day." I can't say when this was, but think it was on Thursday. It must have been before his barn was burned. Beebe said further: "I have been on fire to-day in my house in three places." I stopped but a few moments, and then went on home. He said he had three fires in his house that day; or one of them, perhaps, might have been the day before. I think, upon reflection, he said that on that day there had been, one in the girl's room, one in the west front chamber, and one the day before in the wood-house. He also said that he and his wife had been up on Thursday night by turns, and that they did not know but that they should be burned up; that he did not know but that some one wanted to burn them up; and that it was all very mysterious. He talked about matches. Said he did not know how the fires occurred; that he did not know

but that the boys had been in the rooms in the evening, and had dropped sparks from the candle ; that in fact he knew not how to account for it."

2. The testimony of Charles Shepard, the president of the Insurance Company, which was as follows :

" I was present in the office of the company, at Hartford, when Lay called there, and this policy was issued. On Tuesday forenoon, Lay came to the office and presented two applications. There was nothing unusual about them. Lay then took up the application of Bebee, and said there was something peculiar about that one; that Bebee came on Saturday and got his property insured; and that before he got home, one of the barns mentioned in the application, had burned down. I then asked Lay if Bebee had any reason to suspect that any one did it; he said, not that he knew; that Bebee was a most respectable man, generally esteemed, and he did not believe that he had an enemy in the world. I then asked Lay if he could account for the fire; he said he could not; that it was one of those mysterious circumstances that he could not account for. I do not remember that he spoke of any other fire, and my attention was only called to the burning of the barn. I then directed the secretary to make out the policy. It was issued at the ordinary rate, and delivered to Lay. Applications are sent to the office, lodged on file, and we issue policies from the office. The agents generally receive the money, transmit the application to the office, and we issue policies; we seldom refuse to do it unless some good reason exists for it. Lay was then our agent, and had been for a number of years. I saw an account of the fire and burning of the house in a few days after, and sent an agent down to see Lay, and ascertain if all was right. If he found all was right, he was to direct Lay to deliver the policy to Bebee; but, if otherwise, to direct him not to issue it."

3. The written statement of O. I. Lay, made to the defendants, November 4th, 1853, which was as follows :

" Bebee called on Friday, November 4, 1853 ; said he had been talking for some time of having his buildings insured, and he had come now to have it done.

I asked for measurements, and he not being able to give them very accurately, I told him it would be necessary for me to go up, or for him to make them. Bebee said he would make them, and would be down next morning between 9 and 10 o'clock, as I expected to be absent all the next week; nothing more occurred at that interview, according to my recollection, relating to the insurance.

On Saturday, the next day, Bebee came about 10, with his plan of buildings; application was made accordingly. He signed it, and asked when insurance would take effect, and also asked if it was necessary to pay at that time, or when the policy came. I told him, if he wanted the policy to take effect on that day, it would be necessary to pay then. He paid the premium at about half-past 11 o'clock; said he had had a bed and some shavings on fire, and had put them out. I asked the circumstances—asked if he had any enemy that he thought would burn him up, and he said he didn't know of any one. I think he told me the fires had occurred a short time previously. I do not think that he stated that both fires were on one day, or what period of time had elapsed between them.

He said he had had nobody in his house to stay over night for some time, except a brother-in-law and an old Englishman. I think he did not say that he apprehended that the fires were set. I did not gather that he thought they had been set by an incendiary, but that he considered their origin mysterious. I did not understand that there was any particular danger of fire. I understood him there had been two fires. I did not gather from his statement that there had been more than two.

I think the allusion to fires was after the application was made; I am not certain. Mr. Bebee has since told me it was his impression it was before. I told him I thought not, and I still think not, though I can not be positive.

The above statement is as near the truth as I recollect."

4. A written statement made by the plaintiff, on the 12th day of November, 1853, which was as follows:

" I, James M. Bebee, of Lyme, Connecticut, upon my oath

declare that on Friday, the 4th day of November, 1853, I applied to Oliver I. Lay, agent of the Hartford County Mutual Fire Insurance Company, to insure my house and other buildings. When I mentioned my business, he wanted to know the size of the buildings, and distances, &c. Told him I could not tell. He requested me to take the size and distances, and then he would insure for me. I asked when he could attend to it, and he said any time when I wanted. I then told him I would come down to-morrow morning and attend to it. He said, " You will come while the fire is hot." Next morning I went to Lay's and showed him the plan of the buildings, distances, &c. I said to Lay, ' We have had fires in the wood-house, and in the house.' I think he asked what the fire was in the house. I told him in a bed in the west front chamber; these were the exact words. Mr. Lay then said he had been afraid that his buildings would get burned, for fires frequently occurred when no one knew from what source they came. He inquired how much the bed was burned, and I told him it was about spoiled. I told him I thought the boy might have caught the shavings in the wood-house from a candle. I don't recollect that any more was said about the fires. This conversation I think was had before the application was signed on the 5th of November. I think I am confident it was before the insurance was granted."

Much other evidence was introduced by the parties in support of their respective claims, but which need not be recapitulated.

It was admitted on the part of the defendants,

That Bebee was the owner of the property insured and burned.

That he had made all the preliminary proofs required by the terms and conditions of the policy of insurance.

That the policy declared on was executed and issued in due form, and was correctly set forth in · the plaintiff's declaration.

That the property destroyed exceeded in value the amount of insurance on the same.

That said property was destroyed by Ursula Babcock, at the instance of Elijah B. Avery; and that they were severally tried, convicted, and sentenced for the offence.

That the only defence was, as the defendants claimed, a failure on the part of the plaintiff to disclose, with sufficient fullness, the facts in his knowledge respecting the fires.

The defendants requested the court to instruct the jury, that if the plaintiff communicated to Lay all the facts material to the risk, yet if Lay neglected to communicate those facts to the officers of the company, by whom the policy was issued, and if the policy was issued by those officers without a knowledge of those facts, then the policy ought to be deemed void. The court did not so instruct the jury, but on the other hand instructed them, that if Lay was the agent of the defendants, any neglect on his part was not chargeable to the plaintiff, unless he could be considered as being also the agent of the plaintiff; and the only proof within the recollection of the court, conducing to show that Lay was the plaintiff's agent, was, that the officers of the company had told him, that he must consider himself more the agent of the party insured than of the company; and it did not appear that these instructions were communicated to the plaintiff, or that the plaintiff had any knowledge of them.

The defendants also requested the court to charge the jury, that Bebee, in making his application for insurance, was bound to disclose all circumstances material to the risk, and even his reasonable grounds of apprehension, and that every act and circumstance which could possibly influence the mind of any prudent and intelligent insurer, in determining whether he would grant any policy at all, was material, and that though Bebee might have omitted to state any such circumstance, by accident, inadvertence, or mistake, without fraudulent intention, yet if he did, in making the application for insurance, omit any fact or circumstance, which might have influenced a prudent and intelligent insurer either to decline the risk, or charge a higher rate, his policy was void, and he could not recover. The court did not charge the jury in the

language of the defendant, but upon that point charged as follows: "It is true, as claimed by the defendants' counsel, that any suppression of material facts by a party in applying for an insurance, though by mistake and without actual fraud, will vitiate the policy; a party seeking insurance, is bound to disclose all which can fairly be deemed material to the risk, and if he omits to discharge this duty through stupidity, mistake, or inadvertence, the omission operates as a fraud upon the insurer and avoids the policy, but I do not think he is bound to go into details as minutely as if on the witnesses' stand; he is bound to state fairly the substantial facts and circumstances. It is for the jury to decide what facts are material to the risk, and what facts ought therefore to be disclosed; but while the responsibility of that question is with the jury, and while I intend to leave the matter wholly to you, and do not wish to usurp your province, yet the question is one of considerable practical consequence, and I deem it my duty to say, that if a recent attempt has been made to fire buildings, that fact ought, in my opinion, without doubt, to be communicated to the insurer, and in respect to the details and circumstances that ought to be communicated, much may depend on the conduct of the insurer himself; if the party opens himself to inquiry, he could hardly be expected to go into details concerning which the insurer manifests no interest and makes no inquiry. In general, the party applying for insurance may confine his statement to facts, and is under no obligation to state mere apprehensions and conjectures.

The rule already stated, requiring the insured to disclose all circumstances, material to the risk, is founded upon the idea of fraud, and while the rule ought, on the one hand, to be so applied as effectually to protect insurance companies against fraud, actual or constructive, it ought not, on the other hand, in my judgment, to be so applied as to deprive a man of the benefit of his insurance, who, in making his application, shall disclose such facts as would occur to an honest man of ordinary intelligence, as being material to the risk, although he may omit to go into all the details."

The jury returned a verdict for the plaintiff, and the defendants moved for a new trial, for a misdirection, and also on the ground that the verdict was against the evidence.

*Barbour* and *E. Perkins*, for the defendants, contended,

1. That the disclosure, in regard to previous fires made by Bebee to Lay, was not full and fair, as appears from the testimony. Ang. on Ins., §172. Marsh. on Ins., 465. 2 Johns., 530. 1 Wash. C. C. R., 283. 10 Pick., 402.

2. That Lay was the agent of Bebee in making the application, and therefore, that for any neglect of Lay to state the facts in regard to previous fires to the defendants, Bebee was responsible. Lay's authority was very unlike that of the agents of most insurance companies, who have power to fill up and issue policies.

3. The court should have charged the jury, upon the several points raised in the motion, as requested by the defendants.

*Mc Curdy* and *Wait*, for the plaintiff.

1. It was the exclusive province of the jury to decide what facts were material to the risk, and whether there had been a failure or not, on the part of the plaintiff, to disclose with sufficient fullness the facts within his knowledge respecting the fires.

The plaintiff's statement to Lay was explicit and full, and was substantially exact and true, and made in good faith; conveying adequate information of the danger incident to the risk. *The Glendale Manufacturing Company* v. *The Protection Insurance Company*, 21 Conn. R., 19–32.

2. The verdict, so far from being against the evidence, was fully and clearly sustained by the evidence. A new trial should not, therefore, be granted on this ground. *Bartholomew* v. *Clark*, 1 Conn. R., 472. *Lafflin* v. *Pomeroy*, 11 Conn. R., 440. *Derwort* & ux. v. *Loomer*, 21 Conn. R., 245. *Keeler* v. *Fireman's Ins. Co.*, 3 Hill, 250.

3. Lay being the agent of the Company, in the matter of insuring property, any communication of facts, made by Bebee to him, was in effect made to the officers of the com-

pany; the rule of law being, that notice to the agent is notice to the principal. 1 *Sw. Dig.*, 328. Story on Agency, §140. 1 Pars. on Contr., 63. *McEwen* v. *The Montgomery Co. Mutual Ins. Company*, 5 Hill, 101.

4. The charge of the court, on the other points, is substantially as requested by the defendants, and in those particulars in which there is a difference, it is in accordance with well settled principles of law. Ang. on Ins., ch. 6, 7, 8. Phil. on Ins., 290, 291. 5 Hill, 101.

HINMAN, J. This was an action on a policy of insurance against fire, in which the plaintiff recovered, and the defendants now move for a new trial, on the ground of errors in the rulings and charge of the court, and also on the ground that the verdict is against the weight of evidence in the case.

The first point of law relates to the charge in respect to the agency of Lay. Lay was the local agent of the defendants at Lyme, for the purpose of receiving applications for insurance, and for other purposes, and he testified that the officers of the company had told him that he must consider himself more the agent of the insured than of the company, and as it was an important inquiry in the case, whether the company was fairly apprised of certain facts material to the risk, the defendants requested the court to charge the jury that if the plaintiff did communicate those facts to Lay, yet if he neglected to communicate them to the officers of the company, and the policy was issued by those officers without a knowledge of them, then the policy ought to be deemed void. This claim was very properly rejected; and the jury were told that if Lay was the agent of the company, any neglect on his part was not chargeable to the plaintiff, unless he was also his agent. Of course the company could not make their agent also the agent of the insured, unless the insured chose to recognize him as his agent; and however desirous the defendants may have been that their agent should conduct fairly with applicants for insurance, most applicants, probably, would prefer for their own agent, some one not connected with the company.

We have no reason to doubt that it was the object of the company that Lay should conduct fairly and honorably towards all applicants for insurance; and for the purpose of impressing this duty upon him, it was very proper for the president of the company to say to him that he must consider himself the agent of the insured as well as the agent of the company. But to attempt to dignify a caution of this sort into a real agency for the insured, is wholly unjustifiable both in law and fact, and is rather calculated to change the honorable character of the caution into a snare for the unsuspecting.

Again, the charge is claimed to be erroneous in respect to the disclosure to the agent, of certain unusual circumstances material to the risk. Several fires had occurred in an unusual manner, in the plaintiff's house, just previous to the application for insurance, and it was claimed that, in disclosing this circumstance to the agent, the plaintiff did not go sufficiently into detail, and did not, therefore, give a full and fair disclosure.

Undoubtedly, the insurer is understood to take the risk upon the supposition that nothing material exists that is not fully disclosed. And the fact that his buildings had been on fire a number of times shortly before the insurance was effected, was certainly a very material circumstance, which, if not disclosed, would have rendered the policy void. Such an unusual occurrence tended to a suspicion that incendiaries had attempted and might again attempt to fire his buildings; and this concealment—and silence on such a subject would amount to concealment—would operate as a fraud upon the insurer and render the policy void. *Pars. Mer. Law*, 524. *Curry* v. *Commonwealth Ins. Co.*, 10 Pick., 535. *Clark* v. *Manufacturers' Ins. Co.*, 8 How. U. S., 235.

We have no intention of relaxing, in the least, the rule which requires of the insured the most unreserved frankness on such a subject as this. But we think the charge required this of the plaintiff in this case. The insured is not bound to force his knowledge upon the insurer. In many cases he could not do it if he tried. "He need not," says lord Mans-

field, "mention what the underwriter ought to know; what he takes on himself the knowledge of; or what he waives being informed of." *Carter* v. *Boehm*, 3 Burr., 1905.

Now it is apparent from the evidence, that the alarm of Bebee on account of these fires, was well understood by the agent. When he first applied for insurance, he told the agent that he had had some fires in his wood-house and house, and wanted his buildings insured, and when told that he must first bring the dimensions of his buildings, he replied that he would come the next day. The agent answered immediately, "you'll come while the fire is hot." And when he did come with the dimensions, prepared to effect the insurance, he again told the agent he had had fires in his wood-house and house; that the first fire was discovered in a barrel of shavings in the wood-house; and how it was put out. The agent interrupted him to ask where the fire was in the main part of the house, and he told him in the bed, in the west front chamber. And when asked how much the bed was damaged, he told him it was about spoiled. Then the agent inquired if he had any enemy, or any suspicion of any one, and he told him he could not tell him anything about it, only that these fires had occurred, he could not tell how; it was all a mystery. To this the agent replied, that he had frequently been afraid his house would get burned, for fires frequently occurred and no one could tell how they occurred. Then they had a conversation about slow matches, and as to who had been at the house, and whether any one had been there that the plaintiff suspected of setting fire to the premises.

Now as applicable to these facts, the jury were instructed that any suppression of material facts, though by mistake and without actual fraud, would vitiate the policy, whether the result of stupidity, mistake, or inadvertence; because it operates as a fraud upon the insurer. But that the insured was not bound to go into details as minutely as on the witness stand, but is bound to state fairly the substantial facts material to the risk. And in commenting on the facts, the court told the jury, that much, in respect to details which

ought to be communicated, would depend on the conduct of the insurer; that a party could not be expected to go into details about which the insurer manifested no interest, and made no inquiry; and in another part of the charge it is intimated that it was sufficient to disclose such facts as would occur to an honest man of ordinary intelligence, as being material to the risk, though he may omit to go into all the details.

On a point quite analogous to this, lord Mansfield remarked, that the underwriter, knowing the governor to be acquainted with the state of the place; knowing that he apprehended danger, and must have some ground for his apprehension; being told nothing of either, signed this policy without asking a question. By so doing he took the knowledge of the state of the place upon himself. With some slight variations to adapt this language to the circumstances of the case under consideration, it seems almost as applicable to it as to the case of *Carter v. Boehm.* The material difference in the two cases is that instead of being told nothing, the agent here was told all which occurred to the plaintiff as material to the risk, and he only omitted to go into a full detail of all the circumstances, because the agent not only expressed no desire for more full information, but by his questions to the plaintiff, turned his attention from the subject to the point whether he suspected any one, and if so, whom, as having caused the fires. Is it not correct, then to say, on such a question, that, in respect to details, much must depend on the conduct of the insurer? And if the plaintiff, under the circumstances, disclosed all that occurred to him, and all that would be likely to occur to an honest man of ordinary intelligence, is it not enough?

It may be that the agent did not suppose there was so much occasion for alarm as Bebee appeared to feel. But so long as he did not obtain this erroneous impression by means of anything done by Bebee to mislead him, the consequences of his error cannot be charged to the plaintiff.

On the motion for a new trial, on the ground that the ver-

dict is against the weight of the evidence, but little need be said. Indeed much that has been already said, is perhaps, as applicable to this part of the case, as to the question of law arising under the charge. It is true, the precise number of fires that had occurred on the premises was not stated to the agent; but this seems to have been rather the result of the agent's want of interest in the matter, and of his neglect to make inquiry, than of any fault on the part of Bebee. And taking the whole evidence together, we think there is no reason to believe there was any intentional concealment on his part.

We will only say, therefore, that, considering the well known reluctance of the court to interfere with the verdicts of juries on questions of fact, we are not satisfied that there is even a plausible ground for such interference in the present case.

We do not, therefore, advise a new trial on any ground.

In this opinion the other judges, ELLSWORTH and STORRS, concurred.

New trial not granted.