PLANTERS' INSURANCE COMPANY v. W. G. MYERS.

1. INSURANCE.  *Stipulation.*  *Company's agent made agent of assured.*
   The following was printed upon the back of a policy of insurance: "It is a part of this contract that any person other than the assured, who may have procured this insurance to be taken by this company, shall be deemed to be the agent of the assured, and not of the company, under any circumstances whatever, or in any transaction relating to this insurance." Such stipulation cannot convert the agent who procured the application and made the contract of insurance on behalf of the company into an agent of the assured, such company being authorized by its charter to appoint agents and define their duties, and the agent in question being charged with the duty of soliciting and taking applications for policies, collecting premiums, etc. It is not restrictive of the power of the agent, but an attempt of the company to dissolve the relationship between it and the agent, and to establish it between the latter and the assured. Even if such agent could by stipulation be converted into an agent for the assured, he would still be the agent of the company, for in that capacity he professed to deal with the assured; and he was competent to bind his principal within the legitimate range of his employment.

2. SAME.  *Warranty.*  *Representation.*
   A warranty in a contract of insurance extends to every matter which it embraces, whether material to the risk or not; and the assured commits himself to the literal truth of the same. Representations, though not true, do not affect the contract if not willfully made, or if not material; they are collateral to it, and it is sufficient if they are equitably or substantially complied with.

3. SAME.  *Statements, when warranties, when representations.*
   Statements of the assured which appear on the face of a policy of insurance are not necessarily warranties. Their character must be gathered from the form of expression, the purpose of the insertion, and their relation to other parts of the instrument. Warranties will not be created or extended by construction. Statements in an application for insurance are, ordinarily, representations merely, unless converted into warranties by a reference to them in the policy, and a manifest purpose that the whole shall form an entire contract.

4. SAME.  *Warranty in application.*  *Limited by conditions in policy.*
   A policy of insurance against fire recites that the company insures "subject to the conditions and stipulations indorsed hereon, which constitute the basis of this insurance." And after a description of the property insured, it proceeds: "For a more particular description, and as forming part of this policy by which the insured will be bound, special reference being had to the assured's application and survey." One of the conditions indorsed on the policy is: "That the basis of this contract is the application of the insured; and if such application does not truly describe the property, the policy shall be null and

void. And any false statement or misrepresentation in such application, of facts material to the risk, shall be deemed fraudulent, and be an absolute voidance of the policy.'' The application contains this covenant, following a description of the property to be insured : "And the said applicant covenants and agrees with the said company that the foregoing, with the diagram hereon, is a full and true description and warranty of the condition, situation, risk, and value of the property on which insurance is applied for; and which shall form the basis of this policy." *Held*, that by the above stipulations and conditions of the policy, the application, which contains a warranty, is made a part of the contract, but, the several parts of the contract being construed together, the underwriter assumes the risk, not on the warranty of the assured that his statements are absolutely and literally true, but on the faith that they are true in all respects material to the risk.

5. SAME.    *Contract prepared by insurers.    Errors and omissions.*

Where insurers have assumed the preparation of a contract of insurance, they cannot take advantage of the failure of the instrument to express any fact or circumstance which was duly communicated by the insured, and omitted or misrepresented by the negligence, mistake, or design of their officers or agents. The principle equally applies where the error or misrepresentation is in the application, if it was prepared or dictated by the agent of the insurers.

6. SAME.    *Application.    Answers written by agent.*

Where, in the preparation of an application for insurance, answers are given by the assured to the interrogatories of the agent of the insurers, and the latter writes down or dictates an erroneous deduction or result, he assumes for his principals that it is true, or that it is the equivalent of the verbal disclosure. And in such a case a court of law, borrowing from equity the doctrine of estoppel *in pais*, estops the insurers to insist on a breach of the warranty, or untruth of the representation, but permits the insured to prove the truth of such disclosure—the rule excluding parol proof to vary or contradict a written instrument not being applicable.

7. SAME.    *Material facts must be disclosed by the assured.*

. It is the duty of·an applicant for insurance to make full disclosures to the insurers of all facts material to the risk; and this duty is the same whether required by the charter of the insurers or not. The insurers are entitled to know the whole truth, and the withholding of any material fact is tantamount to a false representation, and will be visited with the same penalty.

8. SAME.    *Overvaluation of property insured.*

Every overvaluation of property for insurance will not avoid the contract of insurance. If the assured, in good faith, puts a value upon his property greatly in excess of its cash value in the market, believing it to be worth the valuation put upon it, and not intending to mislead or defraud the insurance company, then such overvaluation will not defeat a recovery on the policy. To render void a contract of insurance for overvaluation there must be some

element of fraud, or intention to deceive with a view to obtain insurance on the property for a greater amount than could otherwise be obtained.

9. SAME. *Application prepared by agent. Company bound by answers.*
Where the agent of an insurance company participates in the preparation of an application for insurance in such company, dictates the most material answers to interrogatories, and approves and consents to all of them as statements of the truth, the company is estopped to deny the truth of the answers in the application, and cannot make the defense that such statements of the assured are misrepresentations, and as such avoid the policy.

10. SAME. *Notice, or waiver of notice, of other insurance.*
Where an applicant for insurance on certain property gives notice, in his application, that he has applied to another company for insurance to a specified extent upon the same property, and the insurers last applied to, in the face of the policy issued by them, consent that such a policy "concurrent" as the assured had already applied for might be underwritten, that is a sufficient notice, or waiver of further notice, of the issuance of the policy first applied for.

11. SAME. *Warranty, how limited.*
A warranty in a contract of insurance, as to the condition, situation, risk, and value of the property which is the subject of the insurance, cannot be extended to any property, or any matters, not specified in such warranty.

12. SAME. *Conditions and stipulations in policy. Prima-facie warranties.*
All conditions and stipulations contained in the body of a policy of insurance are, *prima facie,* warranties; to the absolute truth of which the parties pledge themselves. In *Coöperative Association* v. *Leflore,* 53 Miss. 16, it was intended to express this rule, but, by a *lapsus calami,* the words "*prima facie,*" before " warranties," were omitted.

13. SAME. *Agent of insurers made agent of the assured.*
A condition on a policy of insurance which seems to declare that in everything relating to the effecting of the insurance the agent who procures it shall be deemed the agent of the insured, and not of the insurers, involves a legal contradiction, and is void. But the agent effecting the insurance for the insurers might, for some purposes, be made the agent of the insured — as, by a stipulation that, if he takes part in preparing the application, he shall be regarded, *pro hac vice,* as the agent of the applicant, and that neither his acts in so doing nor any information communicated to him shall bind them, unless appearing in the writing, and by them approved. Such stipulation, to be binding, should be made known to the applicant in plain and unmistakable language. And good faith would prompt that it should be communicated at or before the preparation of the application; but whether this would be essential to its binding force, *quære.*

14. SAME. *Application prepared by agent. Insurers bound. Relief of insured.*
Where, in the preparation of an application for insurance, the applicant communicates to the agent of the insurers truthful answers to the interrogatories
55 MISS. — 31

propounded, and the agent dictates or suggests the answers which are written down, his acts and doings will be regarded as the acts of his principals. And whether the statements are warranties or representations, if made to contain untruths by the acts of the insurers through their agent, they will not bind the insured, but he will be entitled to relief upon the same principle which authorizes courts of equity to reform written instruments by parol proof, so as to make them conform to the real contract between the parties. And this principle applies as well to covenants and warranties as to other contracts.

ERROR to the Circuit Court of Hinds County.

Hon. S. S. CALHOON, Judge.

W. G. Myers brought this action against the Planters' Insurance Company, to recover upon a policy of insurance issued by that company, insuring certain property against loss or damage by fire. The property insured and destroyed by fire was a gin-house and machinery attached, cotton-press, grist-mill, and cotton and cotton-seed.

The application for insurance was made on a printed form, furnished by the insurance company. Myers, the applicant, was asked fifteen questions, which, with the answers, are as follows :

"*Question.* How large is the gin-house? How many stories? When built? *Answer.* 60×96, main building. Two and one-half stories high. Diagram.

"*Q.* What power is used? *A.* Steam.

"*Q.* Do you use lights? If so, what material? *A.* If used at all, closed lanterns.

"*Q.* Have the premises ever been on fire? If so, when, and how did it originate? *A.* No.

"*Q.* Is there any exposure within 150 feet of gin-house? If so, state nature. *A.* None.

"*Q.* Are you the sole and undisputed owner of the property to be insured? Is the title fee-simple. *A.* Yes. Infant children of owner interested to extent one-third.

"*Q.* Is the gin-house occupied by the owner or a tenant? and is there a reliable head manager on the place? *A.* By owner. Yes.

"*Q*. Is there any insurance on the property now, and in what companies, what amount, and at what rate of premium? *A*. Application made through factors, N. O., for $4,500.

"*Q*. Have you any reason to fear that the property is in danger from enemies or incendiaries? *A*. No.

"*Q*. Have you had any disagreement with hands? *A*. No.

"*Q*. Do you weigh and keep correct account of cotton in seed as put into the gin-house? *A*. I do.

"*Q*. What is the value of plantation on which the gin-house is situated? *A*. $50,000.

"*Q*. If steam-power, is the gin run by the engineer with regular hands, or is it run by the several squads in rotation? *A*. Run by one engineer and experienced ginner.

"*Q*. How many hands have you employed, and do you pay wages or part of the crop? *A*. About 70 — part wages, part renting, part shares.

"*Q*. Is there any incumbrance on the plantation on which the gin is situated? *A*. Incumbrance $10,000, or about."

After a description of the property to be insured, the application contains the following covenant:

" And the said applicant covenants and agrees with the said company that the foregoing, with the diagram hereon, is a full and true description and warranty of the condition, situation, risk, and value of the property on which insurance is applied for, and which shall form the basis of the policy. It being the intention never to insure any property for a sum exceeding two-thirds of its actual cash value, it is hereby agreed that in case the property insured shall become lessened in quantity or depreciated in value, at the time a loss shall occur, then the amount of insurance thereon shall be diminished in the same ratio.

" And I, the applicant, do hereby further agree that the policy of which this application is the basis, and which will be issued thereon, shall be accepted by me with the express understanding that if the note or notes given for the premium,

or any part thereof, shall be past due and unpaid at the time of any loss or damage under said policy, the policy shall be considered null and void." The application is recommended by J. L. Wilson, the agent of the insurance company.

The policy recites that the insurance is " subject to the conditions and stipulations indorsed hereon, which constitute the basis of this insurance." The following are some of the conditions and stipulations indorsed on the policy :

" 1. That the basis of this contract is the application of the insured ; and if such application does not truly describe the property, the policy shall be null and void. And any false statement or misrepresentation in such application, of facts material to the risk, shall be deemed fraudulent, and be an absolute voidance of the policy."

" 7. That persons who have insured property with this company shall give notice of any other insurance already made, or which shall afterwards be made elsewhere, on the same property, so that a memorandum of such other insurance may be indorsed on the policy or policies effected with this company ; otherwise, such policy or policies will be void. This insurance may be terminated by this company, on returning a ratable proportion of the premium for the unexpired term."

" 11. That, in all cases of insurance, this company shall be liable for such ratable proportion only of the loss or damage happening to the subject insured as the amount insured by this company shall bear to the whole amount insured thereon, without reference to the dates of the different policies, or the insolvency of any or all the other insurance companies."

" 14. It is a part of this contract that any person other than the assured, who may have procured this insurance to be taken by this company, shall be deemed to be the agent of the assured named in the policy, and not of this company, under any circumstances whatever, or in any transaction relating to this insurance."

After an enumeration in the policy of the property insured,

it proceeds :  " For a more particular description, and as form-ing part of this policy by which the insured will be bound, special reference being had to the assured's application and survey on file in this office.   It being understood and agreed that, in the event of loss by fire, under this policy, the com-pany shall not be liable for more than two-thirds of the actual cash market value of the property (hereby insured) immedi-ately prior to such loss."   The policy also states : " $4,500 additional insurance permitted, concurrent."

The pleadings and evidence not given above are sufficiently set forth in the opinion of the court.   The court below gave judgment for Myers, and the insurance company sued out a writ of error.

*W. L. Nugent*, for the plaintiff in error.

1. Were the answers to the questions propounded in the application warranties or representations?   I insist that they are warranties, and must be strictly true.   Any statement or description of the property on the face of the policy, or in the application for insurance, which relates to the risk is a war-ranty.   These statements are, in effect, a contract as to the absolute verity of the facts stated.   1 Bennet's Fire Ins. Cas. 179 ; 2 *ib*. 441 ; Fland. on Ins. 205 ; 1 Yerg. 343 ; 16 Wend. 481 ; 7 Wend. 72.

2. It is said that Wilson, the agent, knew all about the facts of the case, and that, through him, the company is to be affected with notice, especially as Wilson agreed to the terms of the answers given to the questions asked.   Is this true? The scope of Wilson's agency was to receive and forward ap-plications for insurance, to take and forward premiums thereon paid, and to receive and deliver policies issued on the applica-tions forwarded by him.   He had no power to bind the com-pany by any contract, to waive anything, or agree upon any answers to questions — particularly to state conclusions from facts in answer to questions calling for the facts themselves. Fland. on Ins. 172 ; 7 Cush. 175 ; 11 Gray, 163 ; 6 Casey, 315.   His knowledge is not to be imputed to the com-

pany. *Rohback* v. *Insurance Co.*, 62 N. Y. 47; 4 Bennet's. Fire Ins. Cas. 331; 51 Pa. St. 315. Besides, by the very stipulation of the policy itself, Wilson is the agent alone of the defendant in error. *Cooper* v. *Insurance Co.*, 50 Pa. St. 299; 2 Bennet's Fire Ins. Cas. 211. The stipulation has been approved in the case of *Rohback* v. *Insurance Company*, 62 N. Y. 61, and we invite the attention of the court to that case as concluding argument. In the absence of fraud, or prevention of statement by the applicant, on the part of the agent, it is not seen or believed that the knowledge of the agent or solicitor is material. *Chase* v. *Hamilton Ins. Co.*, 20 N. Y. 52. No extended argument seems to be necessary on this point, for there can be no objection urged to the validity of the contract as a whole, and it cannot be parceled. No public policy is infringed by it. No good morals or written or unwritten law contravened. The parties to the contract were *sui juris*, capable of contracting, and there is no pretense of fraud or imposition.

3. It is contended, however, that the company's charter prohibits the defense relied upon, and limits defenses to facts and circumstances material to the risk; as to which, it is said, the courts and juries are the sole judges, and not the company which tenders the contract. The section of our charter relied on for this view reads as follows: "That applications for insurance shall state all the material facts and circumstances required by the company." Acts 1874, p. 238. It is argued from this clause that, when information is asked as to matters which courts may conclude are not material to the risk, false answers do not affect the contract made upon the faith of the answers given. Is this the rational construction of the charter? By the 1st section thereof the company is allowed to contract and be contracted with, etc., as a natural person; but this, it is asserted, is limited by the 6th section to the extent asserted. In other words, that the Legislature intended to fetter the domestic corporation by conditions not applicable to foreign corporations — to place it at such disadvantage as nec-

essarily to diminish its utility or break it down in the race for business. No such purpose can, for a moment, be attributed to the Legislature. On the contrary, we may presume that the real purpose was to foster the enterprise — to place it on a higher plane than other companies, and protect it against frauds as far as possible. The power to contract is equal to that of a natural person; the 6th section is addressed to those who desire to make contracts with the corporation. The one relates to the insurer, the other to the insured. To the applicant the law says, You shall state in your application all the material facts and circumstances concerning the risk required by the company. Evidently the power to determine the materiality of facts and circumstances must be conceded to the company. This is done by propounding questions, which must be answered truthfully. Some one must have the right to determine the question of materiality in view of the contract, and logically it appertains to the company, which undertakes to indemnify in case of loss.

The test of materiality is this: whether the misrepresentation of, or failure to state, certain facts was such as to induce the insurers either to insure when they would not have done so if they had known that the premises were circumstanced as they actually were, or to have required a higher premium. On this point the opinion of the officers of a company is admissible in evidence to show that the risk in question would not have been taken had all the facts been known. *Quin* v. *National, etc., Co.,* 1 Jones & C. 316; 1 Bennet's Fire Ins. Cas. 689. It is clearly shown in this case that the risk never would have been taken if all the facts had been known. The power to require statements of facts necessarily includes the power to determine the facts about which inquiry is to be made, and that, in turn, the right to say what is material to the risk.

4. Granting these premises, it is objected that the policy, by some strange oversight of the draughtsman, avoids the force of the stipulations of the application. One of the con-

ditions to the policy is as follows: " That the basis of this contract is the application of the insured; and if such application does not truly describe the property, this policy shall be null and void. And any false statement or misrepresentation in such application, of *facts material to the risk*, shall be deemed fraudulent, and be an avoidance of this policy." It is said that, while under the first branch of this condition the defense would or might prevail, the latter clause limits the true description of the property only to those statements of facts material to the risk. The first sentence of the condition was, doubtless, intended to make the application a warranty in so far, at least, as it described the property. Did the insurer intend, by the latter part of the condition, to reduce this warranty to the grade of a mere representation? The covenant ran otherwise, and there was a purpose manifested to do the very reverse of this. The apparent difficulty may be dissipated by a fair construction of the whole condition, if we proceed upon the idea that the answers to all the questions propounded by the application are to be deemed material to the risk. This is the meaning of the condition. If the application do not truly describe the property, the policy is null and void; and if as to facts material to the risk, other than those which are descriptive of the property alone, there be false statements, they shall be deemed fraudulent, and be an avoidance of the policy because fraudulent. In the one case there is no contract; in the other it is avoided because of the false statement.

It is, however, contended that the covenant at the bottom of the application relates to the " condition, situation, risk, and value " of the very buildings insured, *alone*. What do the expressive words of the covenant mean? Situation, referring to relation, means position with respect to something else; condition, relating to the accidental or changeable, is equivalent to external circumstances or predicament; risk is understood to include hazard, peril, chance of harm or loss. Circumstances, from *circum* and *sto*, refers to the adjuncts of

a fact ; to the state of affairs connected with a person or thing. The word includes all the matters of fact connected with the buildings sought to be insured : the title, possession, ownership, and liens or incumbrances.   Risk goes beyond, while including, these things, and embraces all other matters inquired of, which, in the ordinary experience of men, tend to increase or lessen the chance of harm or loss.   It is not true that mere physical exposure to fire is what is meant by the word "risk." This exposure is an element in the risk, but not the only element.   In so far as the circumstances which might induce a bad man to destroy property insured concur, the risk is increased.   The chance of loss is affected by a "thousand" matters — i. e., the vigilance of the owner, the incumbrances on the property, the disagreement of the owner with his employees, his personal antagonisms, his financial condition, etc. The answers to all the questions propounded were, therefore, included in the expression "the foregoing."

5. It is universally conceded that a false statement as to incumbrances upon the property insured will avoid the policy. *Davenport* v. *New England Ins. Co.*, 6 Cush. 340 ; 2 Bennet's Fire Ins. Cas. 554 ; 4 *ib.* 151.   But it is urged that Wilson knew all about the incumbrances on the premises, and agreed to the answers given.   If the authorities cited do not sufficiently answer this proposition, the contract should not be enforced because of the collusion between Wilson and Myers. The instruction to Wilson required that he should have every fact material to the risk truly stated in the application, and obliged him to inform the applicant that the concealment of any material fact would render the policy void.   It is pretended that the answers as to ownership, incumbrances, and value are substantially correct.   The plantation is valued, in the application, at $50,000 ; Myers swears it is worth $30,000 ; the incumbrance is placed at $10,000, and the trust deed in favor of Estill secures a debt of about $70,000.   Because, in the chancery cause of *Myers* v. *Estill*, there was a decree rendered in favor of Estill for $10,000, the answer is said

to be correct.  But that decree was appealed from and reversed.

6. The litigation with Estill referred to, the receivership,. and extent of the claim due Estill, were all concealed from the company.  These facts, in honesty and good faith, ought. to have been communicated ; they were very material, and would have exercised a controlling influence in this case.  In agreeing upon false answers to the questions propounded, the solicitor and Myers both violated their duties.  They were both guilty of a wrong, and the insured expressly agreed that. the answers, if false, should be deemed fraudulent.  They are false, hence fraudulent, and, if fraudulent, avoid the policy ; else the parties are enabled to take advantage of their own wrong. The solicitor may have known the fact ; the general agent or secretary did not.  It would be unreasonable to ask the company to attach a different meaning to plain answers than that imported in and by their terms.  If done, the result would be that the court would make a contract for the company in violation of its wishes, and fix a liability upon it against which it had never undertaken to provide.

7. The property was overvalued.  The plaintiff in error, because of that overvaluation, was induced to make a contract different from any which, but for that fact, it would have made, and hence is absolved.  *Hosey* v. *Mutual Fire Ins. Co.*, 3 Bennet's Fire Ins. Cas., in 7 Fost. (N. H.) 149 ; 3 *ib.* 779 ; 15 B. Mon. 411 ; 1 Disney, 217.

8. The plaintiff in error was never notified of the additional insurance, nor did the permission for additional insurance ob viate the necessity for the notice required by the policy.  1 Bennet's Fire Ins. Cas. 444 ; 2 *ib.* 120 ; 16 Pet. 495 ; 51 Pa. St. 402 ; 23 Pick. 418 ; 41 N. H. 170 ; 20 Ind. 520.  On this point *Harris* v. *Ohio Insurance Company*, 1 Fire Ins. Cas., *supra*, and *Carpenter* v. *Insurance Company*, 2 *ib.* 120, are controlling authorities.  The cases referred to by opposing counsel will, upon a careful analysis, be found not to antagonize the views I have attempted to present.

*W. L. Nugent* also argued the case orally.

*Harris & George*, for the defendant in error.

1. Statements in an application for insurance are always considered and treated as representations, unless there be a plain agreement to give them the force of warranties. A warranty is an agreement on the part of the assured that the fact so warranted, however immaterial, is as stated; and it must be literally complied with. Because of the injurious consequences resulting from the breach of a warranty, even in a most immaterial point, and because such breach is a forfeiture of the assured's rights under the contract, the courts have, with great unanimity, adopted two general rules: first, that a warranty will not be presumed unless the intent to make one be plain; second, that where a warranty is shown to exist it will not be extended to matters in the contract not embraced within the warranty. In other words, a warranty, both as to its existence and as to its extent, must be made out plainly. *Campbell* v. *New England Ins. Co.*, 98 Mass. 381. No particular form of words is necessary to constitute a warranty. Any statement or stipulation, upon the truth or fulfillment of which depends the validity of the contract, whether appearing as a condition or as warranted, or otherwise, amounts to a warranty. But no particular form of words will make a statement or stipulation a warranty when it is apparent that it is not the intention of the parties to make the validity of the contract depend upon the literal truth or fulfillment of the statement or stipulation. May on Ins., sec. 156.

It is a rule of construction that "every court of justice should endeavor to give such a construction to a policy as will afford a fair security to the person with whom the policy is made; and that upon the ordinary construction of language he is safe in the policy which he has accepted. *Anderson* v. *Fitz-Gerald*, 4 H. L. Cas. 484. Another rule is that, in construing an instrument prepared by the company, and submitted by them to the party effecting the insurance, it ought to be read most strongly *contra proferentes;* and the construction

should, as far as possible, be such as a layman would put upon it. *Fowkes* v. *Manchester & London Ins. Co.*, 3 B. & S. 917 ; May on Ins., sec. 168.

Where the application is referred to and made a part of the policy for all the purposes of construction, the two instruments are to be considered as moulded into one. *Burnett* v. *Saratoga Ins. Co.*, 5 Hill, 188 ; *Fowkes* v. *Manchester & London Ins. Co.*, *supra*. " Where statements or engagements on the part of the assured are inserted or referred to in the policy, it often becomes difficult to determine to which class they belong——warranties or representations. If they appear on the face of the policy, they do not necessarily become warranties. Their character will depend upon the form of expression used, the apparent purpose of the insertion, and sometimes upon the connection or relation to other parts of the instrument. The same rule applies where they are in another paper made part of the contract." *Campbell* v. *New England Mutual Ins. Co.*, 98 Mass. 381. As to the construction of warranties and representations, see, also, *Daniel* v. *Hudson River Co.*, 12 Cush. 416–424 ; *Blood* v. *Howard Ins. Co.*, 12 Cush. 472 ; *Jefferson Ins. Co.* v. *Cathert*, 7 Wend. 72 ; *Forbish* v. *Western Ins. Co.*, 4 Gray, 337–340 ; *Houghton* v. *Manufacturers' Ins. Co.*, 8 Metc., 114 ; *Jones* v. *Manufacturers' Ins. Co.*, 8 Cush. 83 ; *Towne* v. *Fitchburg Ins. Co.*, 7 Allen, 51 ; *Elliott* v. *Mutual Ins. Co.*, 13 Gray, 139.

We insist that, according to the foregoing rules, there is no warranty. We are to construe the application and the policy together, and if there be, in the one, language different from the language used in the other, we must adopt that which is most favorable to the assured. Under this rule the words in the application purporting to be a covenant of warranty of the condition, situation, risk, and value of the property insured, must be treated and held as qualified by the first condition indorsed on the policy, and which (just as the application is) is declared to be the basis of the contract in the cases before cited. The two cannot stand together, if each is to

have the literal meaning which its terms import. The use of the term "warranty" does not always imply a technical warranty. Only where it is apparent that the validity of the contract is made to depend upon the literal truth of the statements, and the literal fulfillment of the stipulations, does a warranty exist. But it is manifest here that, by the first condition indorsed on the policy, the contract is to be avoided only for misrepresentations in material particulars. Wherever this is the case, there is no warranty.

By the terms of the charter of this company (Acts 1874, p. 238) the character of the application is fixed, and it is not competent for the company to give the application a different force from this. The charter requires that the applicant shall disclose all matters, material to the risk, required by the company. This fixes the character of the application. It is not in the power of the insurance company to change it. This charter is the law of the company's being. The company not only derives its existence from the charter, but also all its powers and rights. It has no power not expressly granted, nor necessary to the enjoyment of the granted powers. There are no such powers in a corporation as powers merely convenient and useful. They must be expressly granted, or necessary to the full exercise and enjoyment of a granted power. The 6th section of the charter must have the force and effect of fixing the nature and character of the application, and of prescribing and limiting the obligation of the assured in respect to disclosures to be made by him, or it has no force whatever.

2. If the court should consider that there is a warranty in the application, then we say it can only refer to the property insured, viz., the gin-house, press, cotton, etc., and not to the plantation on which it is situated. The words of the application are, "warranty of the condition, situation, risk, and value of the property on which insurance is applied for." It previously enumerates the property on which insurance is applied for, naming the "gin-house, etc., situated on Belmont

plantation." Nothing which refers to the plantation alone, and does not refer to the " condition, situation, risk, and value of the property insured," is warranted. *Howard Ins. Co. v. Cormick*, 24 Ill. 455–461; *Lindsay* v. *Fire Ins. Co.*, 3 R. I. 157.

3. It is well settled that, when misrepresentation is relied on, the knowledge of an agent of the company of the truth concerning the statement is notice to the company, and prevents the misrepresentation from avoiding the policy. May on Ins., secs. 131, 132, 144, and cases cited. There has been some difference in the courts as to whether this knowledge of the agent of the company would apply where the statement was a warranty; but none where the statement was a representation. *Howard Ins. Co.* v. *Bruner*, 23 Pa. St. 50. " The common ground upon which the several cases proceed," says the Supreme Court of New York, "is that the company is chargeable with all the facts stated by the applicant for insurance to the agent, and he, having truly stated to the agent the real condition of the property, cannot be held to have made any misstatement, or practiced any concealment in reference to the company." *Hodgkins* v. *Insurance Co.*, 34 Barb. 213. See, also, 13 Wall. 222; *Plumb* v. *Insurance Co.*, 14 N. Y. 392; *Beal* v. *Park Ins. Co.*, 16 Wis. 252; *Rowley* v. *Empire Ins. Co.*, 36 N. Y. 550; *Peck* v. *N. L. Ins. Co.*, 22 Conn. 525; *Campbell* v. *Insurance Co.*, 37 N. H. 35; 3 Kent's Com. 373; *Clark* v. *Insurance Co.*, 40 N. H. 333; *Kelly* v. *Troy Fire Ins. Co.*, 3 Wis. 254; *Insurance Co.* v. *Cooper*, 50 Penn. 331. In many of the cases no distinction is made, in this respect, between warranties and representations — the company is bound in all cases. And this is the correct rule where the agent possessed the powers possessed by Wilson. In this case Wilson not only had power to take the application, but it was made his duty to examine the risk, to make out the application, to receive the premium, and to issue a certificate of insurance for fifteen days. Wilson was perfectly familiar with every fact complained of as

misrepresented, knew the value of the plantation and property insured. He directed the answers to be made, which were made ; and he did this in discharge of his express duty as pointed out in the instructions to him. Moreover, the company acted on his recommendation, not relying upon the statements of Myers. See May on Ins., sec. 132 ; *Roth* v. *City Ins. Co.*, 6 McLean, 324 ; *Cumberland Valley Ins. Co.* v. *Schell*, 29 Pa. St. 31.

4. It is contended that the fourteenth condition indorsed on the policy prevents the operation of the rule above referred to — that knowledge of the agent is knowledge of the company. We say that the language of the condition cannot fairly be construed to apply to Wilson, the regularly appointed agent of the company, but must be held to apply only to that class of persons known as insurance brokers, who, without any employment from or agency for insurance companies, undertake for the public generally, and for insurance companies generally, to procure insurance for all applicants. This was the construction put upon the same language by the Supreme Court of New York, in *Alexander* v. *Germania Ins. Co.*, 2 Hun (9 Sup. Ct. N. Y.), 659. See, also, *Rohbach* v. *Germania Ins. Co.*, 62 N. Y. 47 ; *Insurance Co.* v. *Stevens*, 9 Allen, 332 ; *Abbott* v. *Insurance Co.*, 3 Allen, 213 ; *Abbott* v. *Insurance Co.*, 4 Allen, 116 ; *Chase* v. *Hamilton Ins. Co.*, 20 N. Y. 52.

But if it shall be held that this fourteenth condition refers to Wilson, and agents of his class, then we say that it is void. He cannot thus be made the agent of the assured ; and the company, whilst trusting him as agent, paying him as agent, requiring examinations by him as agent, requiring applications to be made out by him as their agent, and acting on his judgment and recommendation as agent, cannot exonerate itself from the relationship of agency.

The charter of this company authorizes it to appoint agents, to prescribe their qualifications and duties, and to take from them bonds for their faithful conduct as agents. Does the

charter give authority to appoint agents for the company, or for the assured? Are these agents the representatives of the company, or of the public? Manifestly, when the statute gave authority for the appointment of agents, it meant to authorize the appointment of representatives of the company, not of others. This power cannot be diverted from its plain purpose by this fourteenth condition. A contract which would make the agent of one of the contracting parties lose his character as such, and transform him into an agent for the other party, is impossible — just as much so as for a thing to be and not to be at the same time. Such a contract is against public policy. No man can be the agent of both contracting parties, having adverse and contradictory interests. If Wilson had contracted with both parties to be their agent in effecting this insurance, such contract would be void. *Spinks* v. *Davis*, 34 Miss. 152.

5. It is insisted that the policy sued on is void for the reason that Myers did not give notice to the plaintiff in error of the second insurance. In his answers in his application, Myers stated that he had then applied in New Orleans for insurance to the extent of $4,500. The policy contained this statement: " $4,500 additional insurance permitted, concurrent." This was an agreement that the additional insurance was then and there allowed. *Benedict* v. *Ocean Ins. Co.*, 1 Daly, 9.

*J. Z. George*, of counsel for the defendant in error, argued the case orally.

SIMRALL, C. J., delivered the opinion of the court.

Wilson, the local agent of the Planters' Insurance Company, in Bolivar County, solicited and procured Myers to effect the insurance in question in that company.

He had been regularly appointed in writing. His general duties were to solicit and procure customers, take applications for policies, collect the premiums, and forward both to the principal office at Jackson, and give binding receipts for insurance for fifteen days. To facilitate him in the business, he

was furnished with printed blanks of applications, to be filled up under his supervision, which were intended to inform the company of all circumstances material to the risk. It must be assumed that Wilson was selected on account of his supposed fitness for the employment. But he was also furnished with printed instructions respecting his duties. He was directed to publish the company as widely as possible, to canvass diligently for customers, to study carefully "the blanks and instructions, so that he would be able at once to *make out* and understand each form of application correctly." In another place he is assured that "a thorough study of the instructions and blanks will enable him to answer any question understandingly, as to the company's manner of doing business," "and he will be able to fill out the blanks rapidly and correctly." He must inform applicants that the concealment of any material fact renders the policy void.

In his deposition Wilson gave an interpretation of what he conceived to be his duty, which accords with the instructions, to wit: "It is my invariable rule to interrogate the applicant, and upon his replies, if necessary, I instruct him how to frame his answers."

The defendant below, the insurance company, contested the plaintiff's right to recover, on the ground that untrue answers were given by Myers to the questions propounded in his application for insurance.

To that the insured replied that there are no misrepresentations or concealments, but the answers are true, whether they shall be regarded as warranties, or representations of the facts pertaining to the condition, situation of the property, the incumbrances upon it, value, etc. And, however that may be, they were fully disclosed to Wilson and known to him, and therefore the company are precluded from setting up that defense.

To that the company rejoins that the insured covenanted with them that, as to all such matters, Wilson should be his agent, and not the agent of the company.

55 MISS. — 32

The questions arise on the covenant in the application " that the foregoing, with the diagram thereon, is a full and true description and warranty of the condition, situation, risk, and value of the property on which the insurance is applied for ; and which shall form the basis of this policy.  *  *  * And I, the applicant, do hereby further agree that the policy of which this application is the basis, and which will be issued thereon, shall be accepted by me, with the express understanding that, if the note or notes given for the premium *  *  *  shall be unpaid at the time of any loss, the policy shall be considered null and void." And, also, the fourteenth condition printed on the back of the policy, to wit : " It is part of this contract that any person other than the *assured*, who may have procured this insurance to be taken by the company, shall be deemed to be the agent of the assured,  *  *  *  and not of this company, under any circumstances whatever, in any transaction relating to this insurance."

The verbiage of this condition is not candid ; it seems to have been used with studied design to obscure the real purpose. It is a snare set in an obscure place, well calculated to escape notice. It is not written or printed on the face of the policy. It is not so much as alluded to in the application ; nor is the agent, in his printed instructions, enjoined to inform those with whom he treats of it.

The average man of the community, the layman, interested in such a policy, after carefully reading it over, may well be supposed to hold this soliloquy :

" What does this mean? Who is the other person referred to, who might have helped to procure the insurance? I called in no friend to aid me with advice. No one was engaged about it, except the agent and myself. Surely the allusion can't be to him, for he acted for and represented the company. If he were meant, the language would have pointed unmistakably to him."

The covert meaning is that Wilson (and all others in his position), in anything done or said by him in procuring the

insurance, " shall not in any circumstances whatever, or in any transaction relating to the insurance," be the agent of the company, but the agent of the assured.

Wilson was constituted agent for the company. The charter expressly authorized the Planters' Insurance Company to appoint agents and define their duties. Acts 1874, p. 138. There is no pretense that Wilson ever surrendered his trust, or that the power was ever revoked.

If he could by stipulation be converted into an agent for the assured, he must be held as also the agent of the company; for in that capacity he professed to deal with Myers. It would be difficult for him to represent both parties as agent, touching the same subject-matter.

Ostensibly he acted for the company in soliciting risks to be taken by it, in receiving and transmitting premiums, and in delivering policies. He was supplied with the requisite forms, and, in effect, was instructed to aid applicants to fill them up. On well-settled principles, he was competent to bind his principal within the legitimate range of his employment. He appeared before the public as their trusted and accredited attorney in fact. It is fair to presume that he had their confidence, and that they indorsed his skill and qualifications.

Surely, credulity cannot be imputed to the public if they accepted and treated with Wilson as the representative of the company within the pale of his employment, and believed (unless his authority was restricted) that he could well do all things within the line of his duties which the company themselves could do. If his powers were restricted within narrower limits than the nature of his business would indicate, it was incumbent on the company to give notice to those who negotiated with him. Therefore, the propriety of the enunciation in *Insurance Company* v. *Mahone*, 21 Wall. 156: " That the acts and declarations of the agent are to be considered as the acts and declarations of the insurer, and the applicant was justified in so understanding them."

Why justified in that conclusion? Because he purported so to act, and was held out to the public in that character by his principal; and the assured had no knowledge of private restrictions, if there were any. It is the suggestion of morality and reason that parties should deal with each other in the characters which they assume.

The fourteenth condition under review is extraordinary; whilst holding on to Wilson as the company's agent, it exacts a covenant from the assured that in all things concerning procuring the insurance, and in all circumstances relating to the insurance, he is the agent of the assured. The object is, plainly, to relieve the company from all responsibility for the acts and declarations of their agent, and to make the assured take the risk of his errors and mistakes.

We do not say that the company could not restrict the apparent and ostensible authority of its agents. It might be altogether fair and reasonable to write or print in the applications, with which the agents were supplied, a notice that the company, in taking risks, would be governed exclusively by the surveys and answers to the written interrogatories, and not by any verbal answers given to the agents, or information imparted to him, unless *written in the application*. That would give notice to customers that the consequences of erroneous answers, or concealments of matters material to the risk, not disclosed in the written application, rested on them, and on them alone. In such circumstances, ordinarily prudent men would seek the advice and assistance of those who were skilled in such matters.

Counsel for the respective parties have directed much of their arguments to the question whether the statements of Myers, as to the condition, situation, title, and incumbrance, are warranties or representations.

A warranty extends to every matter which it embraces, whether material to the risk or not; and the assured commits himself to their literal truth. Representations do not affect the contract if not willful, or if not material. They are col-

lateral to the contract; and it will suffice if they are equitably or substantially complied with.

It is sometimes difficult to determine whether the statements of the assured belong to the one class or the other. When they appear on the face of the policy, they do not necessarily become warranties. Their character must be gathered from the form of the expression, the purpose of the insertion, and by their relation to other parts of the instrument. It is an established maxim that warranties will not be created, or extended, by construction. *Daniels* v. *Insurance Co.*, 12 Cush. 416; *Miller's Case*, 31 Iowa, 226; *Forbish's Case*, 4 Gray, 337, 340.

Ordinarily, statements in the application are representations, unless converted into warranties because of a reference to them in the policy, and a clear, manifest purpose that the whole shall form one entire contract. If the reference to the application is for another purpose, or no purpose is indicated to make it part of the policy, it will be so treated. *Campbell's Case*, 98 Mass. 391; *Snyder's Case*, 13 Wend. 92.

Following the description of the property are these words: "For a more particular description, and as forming a part of this policy by which the assured is to be bound, special reference being had to the assured's application and survey." In an anterior part of the policy is the declaration that the property is insured "subject to the conditions and stipulations indorsed thereon, which constitutes the basis of this insurance." One of the stipulations referred to, and printed on the back of the policy, is as follows: "1st, that the basis of this contract is the application; * * * and if such application does not truly describe the property, this policy shall be null and void. And any false statements or representations of facts material to the risk shall be deemed fraudulent, and be an absolute voidance of the policy."

The application does, undoubtedly, contain a warranty, and is imported into the contract. But the policy qualifies the stipulation in the application, within much narrower limits.

The condition alluded to in the body of the policy is to this effect: that the policy shall be avoided if the assured has not correctly described the property, and if he has made any false statements or misrepresentation in the application, of facts material to the risk. In the face of the policy, the insurers declare, in substance, that they assume the risk subject to this and the other conditions indorsed thereon, "which constitute the basis of the contract." When we come to look closely at what that basis is, we find it to be the statements and representations of facts material to the risk. The falsity of any fact, however trivial and unimportant, the subject of a warranty, avoids the contract. But the underwriter assumes the risk, not on the warranty of the assured that his statements are absolutely and literally true, but on the faith that his statements and representations are true in all respects material to the risk. To avoid the policy the statements must be not only untrue, but such untruth must be predicated of a fact or facts *material* to the risk. If it be about an immaterial matter, no such consequence would follow. A provision that the statements are to be regarded as warranties is controlled by a subsequent recital that the assured is responsible for their truth so far as they are material to the risk. So, if the *covenant* is that the statements are true as to "condition, value, risk," etc., but as to all other matters representations merely. *Lindsay* v. *N. M. Ins. Co.*, 3 R. I. 157; May on Ins. 166, sec. 160.

This case is very much like one recently before Lord Cockburn, *Fowkes* v. *Manchester & London Ins. Co.*, largely quoted in May on Insurance, section 168, wherein the Queen's Bench held that, construing the declaration of the assured and the policy together, the fair import of the contract was "that the assured agreed that his answers to the questions propounded by the company shall be the basis of the contract between them — that is to say, if he was guilty of any fraudulent concealment or designedly untrue statement in these answers, the policy shall be null and void," etc.

So in this case; the first condition refers to the application,

and declares if the assured has made "any false statements or misrepresentations." *Elliott* v. *Mutual Ins. Co.*, 13 Gray, 139, is, perhaps, more in point. Here, the words "misrepresentations or suppression of material facts" were held to control other expressions in the instruments, and to so far control them as to make it clear that the assured did not warrant. We think in this case that Myers is bound by his statements, as representations, and not as warranties. But whether the one or the other, is not material in the view we have taken of the questions contested.

There are two lines of decisions in the books, which pursue divergent lines. The one holds that parol testimony is inadmissible to show the participation of the agent in the preparation of the application — as, that correct responses were made to the interrogatories, but, on the suggestion of the agent, an incorrect result of such responses was written down by the agent, or the applicant at his dictation. These decisions rest on the idea that the object and effect of the testimony is to vary or contradict the written contract. Such were the earlier cases in New York and many other states. That doctrine is still adhered to in Massachusetts, Rhode Island, and Virginia, and perhaps in some other states.

The other class, of later origin, rapidly increasing in numbers and favor, declares that insurance companies constituting local agents to canvass for business, take and forward applications, collect premiums, and give binding contracts of insurance for fifteen days pending applications (such agents as Wilson), must be held responsible for the acts and declarations of the agents, within the scope of the employment, as if they proceeded from the principal.

The general rule, settled by many authorities, is that the insurers cannot take advantage of the omission or misstatement of any fact which it was their duty to state correctly; and this is true when the defect occurs in the application for insurance, prepared by themselves, or any one by them authorized, with a knowledge of all the facts. *Bonley* v. *Insur-*

*ance Co.*, 36 N. Y. 550 ; *Peck's Case*, 22 Conn. 575 ; *Bebee's Case*, 25 Conn. 51; *Franklin's Case*, 42 Mo. 457 ; *Beal's Case*, 16 Wis. 241.

In *Malleable Iron Works* v. *Insurance Company*, 25 Conn. 465, the court said of an agent (equipped for business as was Wilson), that he had an implied power to explain the questions and the answers required, and that his error or omission could not be given in evidence as a breach of warranty by his principals. *Beal's Case*, 16 Wis. 241; *Plumb's Case*, 18 N. Y. 392; *Rowley's Case*, 36 N. Y. 550; *Moleer's Case*, 5 Rawle, 342 ; *Ayer's Case*, 21 Iowa.

In the American Leading Cases, the annotation to Carpenter's case, after a collation and review of the authorities, states this result : " Where the business of the agent is to solicit for his principal, and procure customers, and he misleads the insured by a false or erroneous statement of what the application should contain, or, taking the preparation into his own hands, procure his signature by an assurance that it is properly drawn, the description of the risk, though nominally from the insured, *ought to be regarded as proceeding from the company*." *May's Case*, 25 Wis. 306 ; *Schelliler's Case*, 38 Ill. 166 ; *Wilkinson's Case*, 13 Wall. 236 ; *Insurance Co.* v. *Mahone*, 21 Wall.

If the insurers assume the preparation of the contract, they cannot take advantage of the failure of the instrument to express any fact or circumstance that has been duly communicated by the insured, and omitted by negligence, mistake, or design by their officers or agents. The principle equally applies when the error or misdescription is in the application, if it was prepared or dictated by the agent. *Beal's Case*, 16 Wis. 241.

These cases, and others that might be cited, deny the *applicability* of the rule excluding parol testimony which varies or contradicts a written instrument, and place its competency on another ground, namely, " where one party has by his representations or conduct induced the other party to the transac-

tion to give him an advantage which it would be against equity and good conscience for him to assert, he will not be permitted, in a court of justice, to avail of that advantage." The courts apply the doctrine of equitable estoppel, so beneficial and just when properly used.

It would seem that, strictly, the more appropriate remedy would be a suit in chancery to reform the contract. Those courts that reject the parol evidence, in the great majority of cases, would relieve in that mode. But, as we have seen, the tendency is to attain the same result at law, by allowing the truth to be proved by parol, and giving to it the force of an estoppel *in pais.*

Whether the disclosures of the assured are made warranties or representations is immaterial. The testimony shows what answers were given to the interrogatories to the agent. They bring to his notice the actual facts. If the agent writes down or dictates an erroneous deduction or result, he assumes for his principal that it is true, or that it is the equivalent of the verbal disclosure. The assured would be regarded as declaring to .the insurer, " if the answer, as written, is your understanding of the facts disclosed to your agent, then I am bound by them as ' warranties,' or as representations, .as the case may be." *Mahone's Case*, 21 Wall.

If this were a suit in chancery for reformation of the contract, that court would esteem the verbal statements of Myers, in answer to the interrogatories, as incorporated into the contract, and decree accordingly, if there were no other objections. A court of law would reach precisely the same end, by putting the insurer under an estoppel to insist on a breach of the warranty, or the untruth of the representation. It is but another addition to the numerous instances where courts of law have borrowed principles from the equity courts, and adopted and enforced them. Nor should any limitation be put upon the naturalization into the common law of equitable principles, when its methods of procedure and forms of action are adapted to render complete justice.

In *Chase* v. *Insurance Company*, 20 N. Y. 54, there was a

stipulation in the application (which we have before character-
ized as reasonable) ; it was, " that the company would not be
bound by any act done, or statement *made*, to or by any agent,
or other person, *not contained in the application*."

In the later case of Rohback, 62 N. Y. (1875), literally
the same covenant as in the case before us was sustained. It
had been condemned by the Supreme Court of New York.

Its inevitable effect is to greatly weaken the indemnity on
which the assured rely. It is inconsistent with the acts and
conduct of the insurance companies in sending abroad all
over the land *their agents* and *representatives* to canvass for
risks. It is an effort by covenant to get the benefits and
profits which these agents bring them, and at the same time
repudiate the relation they sustain to them ; and to set up
that relationship with the assured, and that, too, without their
knowledge and consent. It is not a limitation or restriction
of power, but the dissolution of the relationship with them-
selves, and the establishment of it between other parties.

This fourteenth condition attempts a logical and legal impos-
sibility. It converts the agent of one into the agent of both.
He deals with the subject-matter for both contracting parties.
He is instructed by the company to study his documents and pa-
pers, so that he can " readily fill up the blanks ;" he can negoti-
ate for the company for high rates of insurance, and at the same
time his duty to his other principals is to cheapen the rates.
It places the agent in an inconsistent and antagonistic position.
On the one hand, he must ply the people to insure, extend and
increase the business and the profits of the company, and
thereby put money in his own purse. But, in doing all this,
if he blunders and makes mistakes, for these he is the agent
of his customers, and with them is the responsibility.

If he waives a forfeiture by extending the time for the pay-
ment of a premium note, it would be a grave question whether
he represented the company or the assured. If the latter,
there would be no waiver at all. The complications would be
intricate, and almost inexplicable.

Whilst we cannot sustain this condition, we repeat that it is

entirely legitimate for this corporation to limit the powers of its local agents. But if they choose to do so, those with whom they do business ought to be informed of it.

We adopt the doctrine of those cases which hold that, if the agent takes charge of the preparation of the application, or suggests or advises what shall be answered, or what will be a sufficient answer, the company shall not avoid the policy because they are false or untrue, if full disclosures were made by the applicant to him.

We come now to consider whether there are any false representations or concealments that should avoid the policy.

The underwriter was entitled to full disclosures, not merely to know the truth, but the whole truth — a withholding of any facts material to the risk is tantamount to a false representation, and visited with the same penalty.

No serious objection is made to the answer to the interrogatory about the title.

It is said, with great force of reason, that the response to the inquiry about incumbrances lacks fullness, and does not accord with the truth. It was very material to the company to know the extent of the assured's interest in the property, and its value. If he had only an equity of redemption, how much was it worth? The fact was that the incumbrance was for a principal debt of $40,000, with large arrears of interest. It was in litigation, and there had been a decree of the Chancery Court reducing the apparent debt to $10,000, which had been appealed from, and was undecided in the Supreme Court.. These circumstances were important, both in determining whether the risk would be taken and in fixing the rate of insurance.

It is also objected that the answers to the questions as to the value of the plantation, and the gin-house, gin-stands, press, etc., and appurtenances, are untrue in this: that the valuation is excessive.

Every overvaluation will not avoid the contract. There must be some element of fraud, or intention to deceive with a

view to obtain insurance thereon for a greater sum than could otherwise be obtained. The rule approved by the Supreme Court, in *Franklin Insurance Company* v. *Vaughan*, 92 U. S. 519, is that if the assured put a value on his property greatly in excess of its cash value in the market, yet if he did so in the honest belief that the property was worth the valuation put upon it, and the excessive valuation was made in good faith, and not intended to mislead or defraud the insurance company, then such overvaluation will not defeat a recovery on the policy.

In that case the " goods " were valued in the application at $12,000 ; the actual worth, as found by the jury, was $7,804. Yet, there being no fraud meditated, or intention to mislead, the contract was not avoided.

The Planters' Insurance Company gave notice in their blank application, and also stipulated in the policy, that they would only pay, if a loss occurred, two-thirds of the value of the property at the time of the loss — thereby giving themselves a wide margin of safety, and not trusting to the accuracy of valuations.

At best, the value of real estate and structures thereon is uncertain. It is a matter very much of opinion, about which there will be great difference. Myers was asked his *opinion*, and if it was in excess of others, he should not suffer by it, if he meant no fraud or deceit.

The answers to the questions, six, twelve, and fifteen, in relation to the title, the value of the plantation, and the incumbrance, relied upon by the insurance company to defeat a recovery, were given under these circumstances:

Wilson, the agent, states that, at the time the application was filled up, and several years prior thereto, he was intimately acquainted with the Belmont plantation and gin-house, and appurtenances ; that he had specially examined the latter twice, and made two surveys, for the inspection of insurance companies ; and that his invariable custom was (followed in this case) to explain the interrogatories in the printed blanks,

and instruct the applicant how to make his answers ; that he knew that Myers owned two-thirds of the Belmont plantation, upon which the deed of trust in favor of Estill operated to secure a principal debt of $40,000 ; that he was trustee, and a party to the suit which resulted in the Chancery Court decree-ing a balance in favor of Estill of $10,000, which was pend-ing on appeal in the Supreme Court, and undecided.   With all this knowledge, Wilson states :  " Knowing the proper answer to be made to question six, I did instruct Myers how to write down his answer.   Of course I approved the same."

He gives substantially this account of the answer to the twelfth interrogatory :  A good deal of conversation occurred between Myers and himself as to the proper answer.   The prop-erty produced $5,000 income, which would be ten per cent on a value of $50,000.   It was finally settled to give that valua-tion ; and then added that although that might be more than the property would bring in the market, for cash down, " yet it so greatly exceeded the amount of the lien or decree that it was not a matter of importance as to the exact value."   " He did not consider the valuation excessive."

His explanation about the answer to the sixteenth question is to the effect that, knowing all about the matter inquired about, both Myers and himself knew that the incumbrance was $10,000, or thereabouts.   Myers, in his deposition, states that he referred the question of the value of the plantation to Wilson, who, after discussion with him, concluded that the property fairly represented a cash capital of $50,000, " and could fairly be put down at that price."

Wilson also agreed that the answer to the sixth interroga-tory should be as written.

Wilson, who was familiar with the deed in trust for Estill's benefit to himself as trustee, the litigation, and the decree therein, agreed with Myers, after consultation, that the answer to the sixteenth question should be as written in the appli-cation.   Myers further says that he consulted Wilson on all the points of difficulty.

Not to pursue the subject into further detail, it has been clearly proven that Wilson actively participated in the preparation of the application, dictated the most material answers complained of as erroneous, and approved and consented to all of them as statements of the truth, especially within the rule laid down in *Insurance Company* v. *Mahóne*, 21 Wall., and the other cases hereinbefore cited. The company is estopped to deny the truth of the answers in the application, and cannot make the defense that the statements of the assured therein are misrepresentations, so as to avoid the policy.

Myers, in his application, gave notice that his factors had applied for insurance, to the extent of $4,500, in other companies. In the face of the policy the insurers consented that such a policy "concurrent" might be underwritten. That was sufficient notice, or waiver of further notice.

The company does not insist, in this court, on the point that the policy has been forfeited for non-payment of the premium.

The 6th section of the charter (Acts 1874, p. 238) does no more than require the applicant to state "all the material facts and circumstances concerning the risk required by the company." But it does not prohibit the parties to the contract from making warranties if they choose. It is not restrictive of the power of the corporation, but declaratory of the duty of the assured. Independent of this section, it would have been the duty of the assured to have made full and truthful disclosures. The provision is for the benefit of the company, and was not designed to circumscribe its power.

There is great force in the argument of the counsel for defendant in error that the first warranty clause of the application extends no further, and embraces no more, than the "condition, situation, risk, and value," etc., of the property on which insurance is applied for, which property was the house, gin-stands, press, etc.; and, on familiar principles, all else not included in the enumeration is excluded. The very point was ruled in *Insurance Company* v. *Cornick*, 24 Ill. 461.

But, as hereinbefore said, construing all the instruments together, the application and the policy, as constituting the contract, the intent and purpose is reasonably clear that the risk was assumed on the faith that the property had been correctly described, and that no misrepresentations had been made of facts material to the risk ; and that, although there was the warranty, above referred to, in the application, that was qualified by the stipulations in the policy, which was made to depend for its validity on the statements of the application as " representations," and not as warranties.

*Judgment affirmed.*

CHALMERS, J., concurring.

It is said in the opinion of this court (delivered by myself) in *Coöperative Association* v. *Leflore,* 53 Miss. 1 (on page 16), that " it is well settled that all stipulations and conditions contained in the body of an insurance policy are warranties, to the absolute truth of which the parties have pledged themselves." As written, the sentence is erroneous. By some carelessness of the writer the words "*prima facie,*" before. the word "warranties," were omitted, as is apparent by reference to the citation from Bliss on Life Insurance, section 55, from which the statement was taken. It was intended to state that such conditions and stipulations are, *prima facie,* warranties.

In the case at bar, the fourteenth condition printed on the back of the policy seems intended to declare that, in everything relating to the effecting of the insurance, the agent who procures it shall be deemed the agent of the insured, and not of the insurers. As thus stated, it involves a legal contradiction. The agent binds the company, temporarily at least, by the reception of the premium, and this he could not do if he was wholly the agent of the insured, and in no manner that of the insurers. A man cannot bind others by a contract between himself and his own agent.

I see no difficulty, however, in constituting him the agent of

the company for some purposes, and of the applicant for others. For instance, the company might well stipulate that if its agent took part in filling out the application, he should be regarded, *pro hac vice*, as the agent of the applicant, and that neither his acts in so doing nor any information communicated to him should bind them unless transmitted to them by the writing, and by them approved. Such a stipulation, to be binding, should be made known to the applicant in plain and unmistakable language. Good faith would prompt that it should be communicated at or before the making-out of the application, though I will not say that this would be essential. Because the fourteenth condition on this policy was so ambiguous as to be almost unintelligible, I hold it to be unfair, and therefore invalid.

The fourteenth condition being stricken out, I consider it wholly immaterial whether the statements contained in the application be regarded as representations or warranties. The truth as to all the matters inquired about was communicated to the agent of the company. He dictated or suggested the answers which are now complained of as false. His acts, in so doing, were the acts of his principals. Whether the statements were representations or warranties, they were made to embody untruths, by the insurers themselves, acting through their agent. A man is no more bound by a false warranty into which he has been entrapped, by the party with whom he is dealing, than by a false representation.

The principle which relieves the insured in this class of cases is the same that authorizes courts of equity to reform written instruments by parol proof, so as to make them conform to the real contract between the parties. It applies as well to covenants and warranties as to other contracts.

# CASES ARGUED AND DECIDED

IN THE

# SUPREME COURT OF MISSISSIPPI

AT THE

## APRIL TERM, 1878.