### No. 13,254.

J. N. MURPHY vs. ROYAL INSURANCE COMPANY OF LIVERPOOL. IN RE ROYAL INSURANCE COMPANY OF LIVERPOOL APPLYING FOR CERTIORARI OR WRIT OF REVIEW TO THE COURT OF APPEAL, THIRD CIRCUIT, STATE OF LOUISIANA.

#### SYLLABUS.

1. Whilst this court, exercising the jurisdiction conferred by Article 101 of the Constitution, will not undertake to review, either as to law or fact, all cases which may be decided by other courts of the State (since, if that had been the intention of the framers of the Constitution, all cases would have been placed upon the basis of those in which appeals to the Supreme Court are allowed), nevertheless, the jurisdiction thus conferred will be exercised in any proper case, whether presenting issues of law or fact, or both; the question as to what constitutes a "proper case" depending upon varying circumstances and requiring the exercise of a sound legal discretion.
2. An insurance company, like an individual, may limit the authority of its agents, and where direct notice of such limitation, or any notice which a prudent man is bound to regard, is brought home to the assured, he is bound by it, and relies upon any act in excess of such limited authority at his peril.
3. Where, in a case in which neither fraud, nor error, nor subsequent knowledge and ratification by the company, is alleged or proved, the assured signs a contract in which is embodied the "iron safe clause", and accepts and retains,

until a loss occurs, a policy in which said clause is embodied, and which has printed upon its face, a condition to the effect that no. officer, agent, or representative of the company shall have power to waive, or be deemed to have waived any condition of the policy, unless such waiver shall be written upon, or attached thereto, the assured is bound by such clause, as by a promissory warranty, and by such limitation upon the authority of the agent. And the knowledge being thus brought home to him that the agent with whom he was dealing was without authority, verbally to waive such clause and such condition, a verbal waiver alleged to have been agreed on by such agent, contemporaneously with the execution of the written contract, even though proved, without objection, by parol evidence, does not bind the company.

4. The evidence in this case, admitted without objection, was insufficient to establish the alleged waiver.

*White & Thornton* for Petitioner.

Respondent Judges *pro se.*

*John C. Blackman* for Murphy, also Respondent.

The opinion of the court was delivered by

MONROE, J. The defendant asks this court, in the exercise of the authority vested in it by Article 101 of the Constitution, to review the judgment rendered in the above entitled cause by the Court of Appeal for the Third Circuit.

It appears that the plaintiff, Murphy, sued the defendant, in the district court for the parish of Rapides, for $2000, on a policy of fire insurance, for that amount, issued by defendant to cover a stock of merchandise, owned by plaintiff, which was destroyed by fire during the life of the policy.

Defendant denied liability, upon the ground that plaintiff had failed to comply with the "promissory warranty" contained in what is known as the "iron safe clause" in the policy.

The case was tried, in the district court, before a jury, and evidence was introduced to show that the "three-fourths value" and "iron safe", clauses were waived, verbally, by the defendant's agent, at the time of the delivery of the policy.

There was a verdict for the plaintiff, in the sum of $1000, which amount was increased, upon appeal to the circuit court, to $1863, and, a rehearing having been refused by the latter tribunal, the defendant presents to this court the application which we have now to consider.

Murphy vs. Royal Ins. Co. of Liverpool.

In their return, the respondent judges refer to their written opinions (original and on application for rehearing), as embodying sufficient reasons why the judgment, as rendered, should remain undisturbed.

In those opinions it is conceded that, unless waived, the clauses mentioned should be considered part of the contract and the assured should be held bound by them; the opinion of this court, in Goldman *et al.* vs. Insurance Co., 48 Ann., 223, being accepted as conclusive upon the point. It is held, however, that it was competent for the defendant's agent, verbally, to waive such conditions at the time the said contract was entered into, notwithstanding the provision therein to the effect that no agent should be authorized to waive any of its conditions except by written agreement endorsed thereon; and, upon the question as to whether there was such a verbal waiver, it is said: "It " is true that the testimony in this case is conflicting and contradic- " tory, but, in such cases, it is an elementary rule of law that appellate " courts will not disturb the verdict of a jury on a question of fact. " The jury passed on the question of waiver and we cannot say that " there is such manifest error in its findings as to justify us in re- " versing its verdict." Upon the question of the amount, however, it was held that the error in the verdict was manifest, and the amount allowed was accordingly increased from $1000 to $1863. The court also appears to have held that, whilst the "iron safe" clause was waived, the "three-fourths of value" clause was not waived.

The "iron safe clause" provides, in substance:

"1. That the assured will take an inventory once a year.

"2. That he will keep books showing his sales and shipments.

"3. The assured will keep such books and inventory, and also the " last preceding inventory, if such has been taken, securely locked in " a fire-proof safe at night, and at all times when the building men- " tioned in this policy is not actually opened for business; or, failing " in this, the assured will keep such books and inventories in some " place not exposed to a fire which would destroy the aforesaid build- " ing."

"In the event of failure to produce such set of books and inventories, " for the inspection of the company, this policy shall become null and " void and such failure shall constitute a perfect bar to any recovery " thereon."

It appears that an inventory was taken and that plaintiff's business transactions were entered in books, but, upon the other hand, it is ad-

mitted that such books were left upon the night of the fire in the building containing the insured merchandise, that they were not "securely locked in a fire-proof safe", and that they were destroyed by the fire which occurred, when the building in which they were left, and which contained the merchandise insured, was not actually open for business. If, therefore, the conditions contained in the "iron safe" clause were not waived, there is no question as to their breach.

The plaintiff claims that said conditions were verbally waived by defendant's agent, at the time that he delivered the policy. The defendant, for answer, points to the following provision, which is plainly printed on the face of the policy, to-wit:

"This policy is made and accepted according to the following stipu-"lations and conditions, together with such other provisions, agree-"ments or conditions, as may be indorsed thereon, or added thereto, "and no officer, agent, or other representative of this company shall "have power to waive any provision or condition of this policy, except "such as, by the terms of this policy, may be the subject of agreement "indorsed hereon, or added hereto; and, as to such provisions and "conditions, no officer, agent, or representative shall have such power "or be deemed, or held, to have waived such conditions or provisions, "unless such waiver, if any, shall be written upon, or attached hereto, "nor shall any privilege or permission affecting the insurance under "this policy exist or be claimed by the insured, unless so written or "attached."

It will be observed that there are two distinct provisions in this clause, viz: one, which prevents any officer, agent or representative of the company from waiving any condition in the policy except such as, *by the terms of the policy may be the subject of agreement* indorsed thereon; and another, to the effect that no officer, agent, or representative shall have power to waive, or shall be deemed to have waived, any condition of the policy unless such waiver is written upon or attached to the policy. No issue has been raised upon the basis of the first provision, and it may be passed over without further comment.

As to the second provision, the parol evidence, offered to show the waiver, was admitted without objection, and we need not, therefore, consider the question of its admissibility in view of the provisions of Article 2276 of the Civil Code, but may deal with the matter solely with reference to the authority of the agent and the sufficiency of the proof.

The defendant, being a corporation, must act through an officer, agent or representative, and can act in no other way, so that, to say that no officer, agent, or representative, shall have power to waive or shall be deemed to have waived any condition of a contract made by it, for its advantage, is to say that the company has no such power, which would be to deny the company a right of which it can be deprived neither by the courts nor by any act of its own. The condition requiring the waiver to be in writing, like any other condition for the advantage of the company, may, then, be waived by the company, acting through an officer, agent, or representative, authorized for that purpose.

To determine whether it *has* waived any of the conditions of the contract sued on, we must, first, inquire whether the officer, agent, or representative, through whom it is said to have acted, was so authorized, or whether the plaintiff, in dealing with him, was justified, by the conduct of the company, in believing that he was so authorized, and we must, next, inquire whether, as a matter of fact, he did the act which the plaintiff attributes to him.

There is no affirmative evidence in the record which establishes the precise extent of, or limitations upon, the power of the agent of the company through whom the contract in question was made. This, however, is unimportant, for the reason that, as between the company and the plaintiff, the former is bound by the acts of the agent, done within the scope of the authority *apparently* conferred on him; whether, as between the agent and the company, such authority was actually conferred or not. Nor, does it matter whether we call the agent a general, local, or sub-agent, since the important question is, not what we may call him, but what he *is*, or what the plaintiff, influenced by the manner in which he was held out by the company, was justified in accepting him as and believing him to be.

The company appears to be a foreign corporation, having its domicile in Liverpool, England. The policy sued on is signed, "The Royal Insurance Company, by their Attorneys." (Signed) "Barbee & Castleman, Managers Southern Department." And Barbee & Castleman appear to be established at Louisville, Kentucky.

There is, however, printed upon the face of the policy the following provision, to-wit:

"This policy shall not be valid until countersigned by the duly au-

" thorized agent of the company at Opelousas, La." And it is, accordingly, countersigned by A. L. Lacombe as the agent at Opelousas.

The evidence shows that A. L. Lacombe received the application for insurance, passed judgment upon the character of the risk, agreed upon the amount and term of insurance, and the premium, and delivered the policy,—all without reference to, or communication with, Barbee & Castleman. From which it follows, and there is no denial of the fact by the company, that he was furnished with a form of policy, containing the printed conditions prescribed by the company, and signed by the managers, but, otherwise, in blank, and that he was authorized to fill up the blanks as occasion might require. He, accordingly, wrote the name of the assured, the amount of the premium, and the amount and term of the insurance, upon the face of the policy, and he wrote, or caused to be written, with a type writing machine, upon a separate slip which is attached to, and upon the face of, the policy, the description of the property insured.

Upon this slip is also to be found in legible print :

1.    Permission to the insured to keep coal oil and gun powder.

2.    The "three-fourths value clause."

3.    The "iron safe clause."

Mr. Lacombe also received and receipted for the premium, a few days after the delivery of the policy.

This method of doing business indicates the scope of his authority, but. there are some things which, also, and quite as clearly, indicate limitations upon that authority, and go to show that he was not vested with all the powers of the company represented by him; thus :

1.    As the policy declares, upon its face, that it is to be countersigned by him, the implication is clear that, in order to bind the company, it should first be signed by some other officer or agent; and this fact. as also the character, or identity, of such other officer or agent, is made apparent by the form in which the policy is drawn, as well as by the signature of Barbee & Castleman, as "Attorneys" of the company and "Managers Southern Department". It is, therefore, plain upon the face of the instrument, that it required the signatures of Barbee & Castleman *and* of the agent at Opelousas in order to make it a contract such as the company contemplated entering into.

2.    The policy declares, upon its face, in bold type, that no officer, agent, or representative, of the company shall have power to waive, or shall be deemed to have waived, any of its conditions, unless such

waiver shall be written upon, or attached to, the policy. Conceding, now, that the company, itself, might waive, verbally or otherwise, any condition of the policy, including the condition that there should be no waiver except in writing, and conceding that whatever can be done by the company, must, of necessity, be done by some agent or representative, duly authorized, it by no means follows that the particular agents, who, acting together, were authorized to execute the policy in question, had authority to waive its conditions in any other than the prescribed form, and still less does it follow that one of them, acting alone, could undo that which it required both of them to do. To waive the conditions of the policy, is to make a new contract; but, as we have seen, the signatures of two agents are required for that purpose, and there is no reason to suppose that the company intended that one of those agents, acting independently, and, without the concurrence of the other, should make a contract by waiving conditions, any more than by originally signing the contract by himself.

An insurance company has the right, which individuals have, of selecting its agents, and defining and limiting their powers. It may not only prescribe what such agents may do, but how they shall do it, and, where it, directly, or by implication, confers upon two agents, acting conjointly, the power to make a contract according to a prescribed form, and prohibits the alteration of that form, save in a particular manner, such agents are bound by their instructions, and third persons, dealing with them, are equally bound, provided they have knowledge, or are in a position where the law will impute to them knowledge, of such limitations and restrictions of authority. And, in such a case, even if the inference be justified that the two agents, acting together, are vested with the whole power of the company, and may disregard the limitation of authority as to the form of waiver, such inference does not lead to the conclusion that one of them, acting alone, can not only unmake a contract which it requires the conjoint authority and action of both of them to make, but that, in doing so, he can ignore a prescribed form which can be waived only by a person exercising all the power of the company.

The general principles of law, which, as we think, ought to govern the case, are stated clearly enough by the text writers, and by many eminent jurists, though there are, no doubt, not a few adjudged cases in apparent conflict with them. The following excerpts appear to us to be applicable to the points at issue.

"The authority of an agent must be determined by the nature of
" his business, and is, *prima facie,* co-extensive with its requirements.
" It cannot be limited by special private instructions unless the in-
" sured has notice, or there is something in the nature of the business,
" or the circumstances of the case, to indicate that the agent is acting
" under such special instructions.    A provision in the policy that
" agents are only authorized to collect premiums upon receipts fur-
" nished and signed by the president and secretary of the company, is
" notice of such limitations of the agent's powers.  (Mersereau vs.
" Phoenix Mut. Life Ins. Co., 66 N. Y., 274; Catoir vs. Am. Life Ins.
" Co., 33 N. J., 487).   So is a provision in a policy that they cannot
" waive any of its conditions."

    *       *       *       *       *       *       *       *

"A general agent, in the strict legal sense, is one who has all the
" powers of his principal in the business in which he is engaged; an
" extent of authority not often granted in insurance.   In that busi-
" ness an agent is termed a general agent rather with reference to the
" geographical extent of his authority, in contradistinction to a local
" agent, who may have original powers, though exercising them within
" more restricted limits; and the general agent may appoint local
" agents and sub-agents, while a local agent cannot.   But there seems
" to be no very well defined distinction between the powers of general
" agents, local agents, and sub-agents, and, therefore, it may, in any
" case, become a question of fact for the jury."
May on Insurance, No. 126.

"The same rules apply to insurance companies as apply in the case
" of individuals, and a person who is clothed with power to act for
" them at all, is treated as clothed with authority to bind them in all
" matters within the scope of his real or apparent authority.   Persons
" dealing with them in that capacity, are not bound to go beyond the
" apparent authority conferred upon them, and inquire whether they
" are, in fact, authorized to do a particular act for the company.   It
" is enough, if the act is within the scope of their apparent power, and
" beyond this, third persons are not bound to make inquiry."   Wood
on Insurance, Sec. 405.

    *       *       *       *       *       *       *       *

"In all cases where the assured has notice of any limitations upon
" the agent's power, or where there is anything about the transaction
" to put him on inquiry as to the actual authority of the agent, acts

" done by him in excess of his authority are not binding, as where it is
" generally known that limitations are imposed in certain respects.
" So, where direct notice, or any notice which a prudent man is bound
" to regard, is brought home to the assured, limiting the powers of the
" agent, he relies upon any act in excess of such limited authority at
" his peril. That an insurance company has a right, in a fair way, to
" limit the powers of its agents, must be conceded, and when it does
" impose such limitations upon his authority, in such a way that no
" prudent man might be mistaken in reference thereto, it is not bound
" by an act done by its agent in contravention of such notice. This
" was recently well illustrated in a very ably considered case before the
" court of appeals, in which a life insurance company had printed
" upon all of its policies a notice that no agent had a right to 'receive
" any premium after its being due, without special permission from
" the officers of the company.' The assured died Sept. 14, 1872, and
" the defense was that the semi-annual premium, due August 31, 1872,
" was not paid. To obviate the forfeiture, it was shown that the gen-
" eral agent of the company gave the assured credit for the premium,
" or rather waived its payment according to the requirements of the
" policy, and agreed to keep him good with the company. The plain-
" tiff had a verdict at circuit, but it was set aside in the court of ap-
" peals, *upon the ground that the agent had no authority to waive pay-
" ment of the premium, and that the assured, in the face of the notice
" printed upon his policy, had no right to rely upon his authority to do
" so.* Miller, J., dissented from this doctrine, and wrote a very able
" dissenting opinion, but it will be noticed that he leaves out of sight
" the express notice given to the assured, that the agent had no au-
" thority to waive the payment of the premium at the precise time
" when it became due, without special permission from the officers of
" the company, and predicates his views on a class of cases *where no
" such limitation was noticed to the assured.* Upon the authority of
" this case, and, indeed, without it, there is no question but that an
" insurance company may lawfully limit the authority of its agents,
" *and when it does so, and the assured knows, or, as a prudent man,
" ought to know of such limitation,* he deals with him in reference to
" matters in excess of his power at his own peril. This has been held
" in numerous cases, cited elsewhere in this chapter, and is an ele-
" mentary principle in the law of agency." Wood on Insurance, Sec.
411.

      *      *      *      *      *      *      *      *

"The rule is not a doubtful one, either in policy or principle, that, "in transactions of this character where one of two persons must sus- "tain a loss, the loss must fall upon him who has made it possible for "the other, innocently, to be placed in a position where loss might re- "sult to him except for the application of this rule. It would be dis- "astrous to commercial, as well as to other, interests, if a person, by "acting through the agency of another, could shield himself from lia- "bility for such person's acts, *ad libitum.* Fortunately, no such rule "exists, *and he who entrusts authority to another, in whatever depart-* "*ment of business, is bound by all that is done by his agent within* "*the scope of his apparent power, and cannot screen himself from the* "*consequences thereof upon the ground that no authority in fact was* "*given him to do the particular act, unless the act was clearly in ex-* "*cess of his apparent authority, or was done under such circumstances* "*as to put the person dealing with him upon his inquiry as to the real* "*authority of the agent;* and no exception to this rule exists in the law "of insurance. It is always a question of fact, whether the act was "done under such circumstances that the assured had a right to be- "lieve that the agent was clothed with authority to do the particular "act in question.

"*The rule may be said to be that, unless notice is given to the as-* "*sured that, in respect of certain matters, within the scope of his* "*apparent authority, certain limitations are imposed upon the agent,* "*his acts, within the scope of such authority, shall be treated as the* "*acts of his principal and not the acts of the person with whom he* "*deals as the representative of the principal, even although the policy* "*declares him the agent of the assured. The question is not what the* "*powers of the agent, in fact, were, but what power did the company* "*hold him out as possessing.*"

Commercial Ins. Co. vs. Ives, 56 Ill , 402; Columbia Ins. Co. vs. Cooper, 50 Pa. St., 331; Poche vs. Hartford Ins. Co., 25 Conn., 51; Ins. Co. vs. Wilkinson, 13 Wall; Eclectic Life Ins. Co. vs. Fehren- krug, 68 Ill., 463.

"From the business with which the agent was entrusted, had the "assured the right to understand that he had authority to do the par- "ticular act in reference to which the principal denies his authority? "In order to charge the company, the assured must, from the facts, be "warranted in relying on it that the agent had authority to do the act

" in question, and to bind the company in respect of the matter with
" which it is sought to charge".

\*　\*　\*　\*　\*　\*　\*　\*

"When the assured *knows, or ought* to know the extent of the agent's
" authority, he cannot charge the principal for matters in excess
" thereof (Galbraith vs. Arlington Ins. Co., 12 Bush (Ky.) 29; Vose
" vs. Eagle Ins. Co., 6 Cush. (Mass.), 42; Lowell vs. Middlesex Ins.
" Co., 8 Cush. (Mass.), 127), and, if the assured knows the extent of
" the agent's power, and concludes with him a contract in excess
" thereof, he can derive no benefit therefrom". Wood on Insurance,
Sec. 416.

\*　\*　\*　\*　\*　\*　\*　\*

"That an agent may waive a forfeiture is well established by
" authorities. *But where a limitation is imposed upon the power of an*
" *agent, upon the face of the policy, of which the assured, as a prudent*
" *man ought to know;* and there is no evidence that the agent has
" been accustomed to act in excess of such power, with the express or
" implied consent of the insurer, the insured is not justified in dealing
" with him in reference to such matters, and his acts, as to the excess
" of authority, are not binding on the company. Catoir vs. Ins. Co.,
" 33 N. J., 487; Mersereau vs. Phœnix Ins. Co., 66 N. Y., 274. In
" commenting upon such notice, given to a policy holder in a New
" York case, Allen, J., announced what we conceive to be the rule ap-
" plicable and generally held. He said: 'In the face of a distinct
" written expression in the policy of a want of power in the agent, the
" party suing to recover upon such policy has no right to infer the
" subsequent existence of such power by any uncertain sign. There
" must be evidence to justify the belief that the company, by direct
" authority, enlarged the authority of the agent, or that they know-
" ingly permitted him to act for them beyond the scope of the power
" originally conferred.' "

(All italics are the author's). Wood on Ins., Sec. 417.

\*　\*　\*　\*　\*　\*　\*　\*

"The general principles of the law of agency are applicable to in-
" surance, as well as other, agents, and they need not be re-stated
" here. But the business of insurance is carried on almost exclu-
" sively, and to a greater extent, perhaps, than any other, through such
" mediums. This has given rise to doctrines of law, either peculiarly

" applicable to insurance agents, or sufficiently important to be set out " in this connection. In determining the authority of the agent in any " matter connected with his business, regard must be had to the man- " ner in which he is held out by the company, and the particular cir- " cumstances of the parties or transaction."

The provisions of the policy respecting his authority are, "however, " usually held to be binding; but, as the cases cited show, where he is " not so limited, and is entrusted with the execution of policies, his " acts in behalf of the company, even to the extent of changing the " printed portions of the policy, are binding upon the company, where " they fall within the authority, which he is held out as having, or are " justified by the usual mode of transacting such business, and the " scope of his employment, or the particular circumstances of the " case."

A. & E. Enc. of Law, Vol. 11, p. 320.

    *      *      *      *      *      *      *      *

"Where a policy, for instance, provides that procuring additional " insurance without consent of the company shall avoid it, and that " the agent has no authority to nullify its conditions, and the assured " procures additional insurance upon the representation of the agent " that it will be all right, the company is not estopped to deny its " liability, though the insured, through no fault of the company, or its " agent, had never seen the policy, and though the agent had authority, " in a certain way, to consent to additional insurance, and had done so " in other cases, he not having consented in this case within the line of " his authority or in the manner prescribed in the policy.

"Cleaver vs. Traders' Ins Co. (Mich.), 39 N. W., 591.

"A. & E. Enc. of Law, Vol. 11, p. 323."

We take the following excerpts from "Ostrander," from the brief furnished by relator's counsel, the volume itself not being at hand:

"When the policy provides, in distinct language, as occurs in " most cases, that no agent shall have power to change or modify its " terms or waive any of its conditions, except by distinct and specific " agreement, indorsed in writing thereon, the assured will be presumed " to have notice, after the policy has been delivered to him, that the " agent has no power to make any change in the terms and conditions " of the insurance except in the manner provided, and any attempt on " the part of the agent to waive, by oral agreement, any of the policy " conditions will be a nullity. The courts have held in numerous

" cases that it was competent for insurance companies to limit the
" authority of their agents in this manner. It is for the interest of
" both parties and for the interest of the general public that contracts
" of this class, involving, as they do, many complex subjects of agree·
" ment, should be set forth in precise terms and reduced to writing.
" The ·memory· is always 'slippery' .and should never be relied on in
" important transactions, and especially where months and years may
" intervene between the promise and its fulfillment. The requirement
" that agreements changing the form and substance of the contract,
" should be in writing, is intended to promote peaceable and friendly
" relations between contracting parties, and to lessen litigation by
" substituting the written word for indistinct and· obscure under-
" standings. The insurance company is frequently dealing, through
" agencies, with a large number of persons, located at remote places.
" The necessities of a business so extended demand that the obliga-
" tions entered into should be clearly stated, and put in such form of
" performance' that' the verity of the promise made can not, subse-
" quently, be questioned and made the subject of contention and of
" legal inquiry."

Ostrander on Fire Insurance, p. 131, Sec. 49.

"There is another class, which is usually referred to by the courts,
" and distinguished as general agents. While this class is more im-
" portant' in respect to its duties and responsibilities, and has larger
" liberties, its powers, nevertheless, are limited to making contracts
" of insurance, fixing rates, filling up and countersigning policies, and
" collecting premiums. Having power to make a completed contract,
" they will also be presumed to have power, by agreement with the
" assured, to 'change, alter, or nullify,' its terms and conditions, at any
" time after the delivery of the contract, and after it has become
" binding between the parties, unless limitations are imposed, of
" which assured has notice. The form of policy, however, now in gen-
" eral use, restricts the· authority of an agent, in regard to changing
" the terms of the insurance or waiving any of its conditions, to
" written indorsement. Under policies of this form, the agent has no
" power· to enlarge or otherwise to change the obligation of the com-
" pany by parol. It can only be done in the mode which the policy
" provides."

Ostrander on Fire Ins., p. 551, Sec. 265.

❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋

"The attorney can not go beyond the limits of his procuration;
" whatever he does exceeding his power is null and void with regard to
" his principal, unless ratified by the latter, and the attorney is alone
" bound by it, in his individual capacity." C. C., 3010.

"The principal is bound to execute the engagement contracted by
" the attorney, conformably to the power confided to him. For any-
" thing further, he is not bound, except in so far as he expressly ratifies
it." C. C., 3021.

※  ※  ※  ※  ※  ※  ※  ※

In Reeve, Case & Co. vs. Phœnix Ins Co., the proposition was urged
that the clauses relied on by the company were unusual, and that the
attention of the assured was not especially called to them. This court
said:

"*First.* We do not think the unusual character of these clauses in
" New Orleans, if established, could affect the right of the defendant,
" under the circumstances of this case. The policy was accepted by
" the insured nearly a month before the fire; the assent of the insured
" to all its provisions is presumed; and to allow the express contract of
" the company to be varied or impaired by the contracts of other com-
" panies in the same city would be very dangerous."

"*Second.* There is no evidence to establish the serious charge that
" the agent of the company concealed those clauses from the assured.
" He signed and delivered to them the policy in the usual way. The
" clauses in question are printed plainly in the same type as the rest of
" the body of the instrument, with the first words of each in capitals,
" and attention called to the paragraphs respectively by an index.
"(  ) If the insured did not examine the policy, it would seem to
" have been their own fault." 2 Cranch, 444.

"*Third.* We do not think that the right of the defendant can be
" impaired by the fact that the attention of the insured was not espec-
" ially directed to these clauses. As before remarked, the policy was
" executed and delivered to the assured in the usual way. It is not a
" long document. It could be read in a few moments. It remained in
" the possession of the insured for twenty-six days before the fire. We
" think the insured must be held to be fully bound by its terms."

Reeve, Case & Co. vs. Phœnix Ins. Co., 23rd Ann., 220.

※  ※  ※  ※  ※  ※  ※  ※

"Where the conditions are written or printed on the face of the
" policy, the assured, by accepting it, becomes bound thereby, and is
"estopped from denying that he assented thereto."

Wood 9; 2 La., 399; Adams vs. Ins. Co., 36 Ann., 660.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊ ·　　　＊

"On the trial, the plaintiffs produced the written proposal made by
" the company and accepted by them, to show that a voyage, such as
" that on which the schooner was lost, entered into the contemplation
" of the parties; that it was so particularly understood by the plain-
" tiffs, and that the terms inserted in the policy must have been placed
" there through error or fraud.    The court received the evidence,
" though objected to; and the jury having found a verdict against the
" defendants, which was affirmed, they appealed.

"We think the court erred.   Admitting the document offered to be
" legal evidence to control the written policy in any case (on which
" we express no opinion), we are satisfied that it could not be intro-
" duced by the plaintiffs in the present action.   If error or fraud occa-
" sioned a contract to be executed in writing different from the inten-
tion of the parties, it was the duty of the party relying on such allega-
" tion, to make it the basis of his action, to give notice of it to the
" defendants, and to afford means to them to meet, and, if in their
" power, to refute it."

Lippincott vs. La. Ins. Co., 2 La., 399.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"The assured can not plead ignorance of the clauses in the policy.
" It was their duty to read the policy, so as to determine whether or
"not it was made in accordance with the application.   ＊   ＊   ＊   A
" person dealing with the insurance company ought at least to know
" the general course of its business, and, if he desires exceptions in
" policies to be avoided, he ought to state the fact in his application,
" and be willing to pay the additional premiums for the risk."

Weinberger vs. Merchants Ins. Co., 41 Ann., 31.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"This brings us to consider the following stipulation or covenant of
" the policy.   'And it is further expressly covenanted by the parties
" hereto that no officer, agent or representative of the company shall
" be held to have waived any of the terms and conditions of this
" policy, unless such waiver shall be indorsed hereon in writing.'   The

" evidence of such pretended waiver was oral. It was objected to by
" the learned counsel for the appellant on that account, and the objec-
" tion was overruled. This, we must hold, was error. We know of
" no good reason, and are aware of no authority, by the decisions of
" this court, that should cause us to declare the above covenant or
" stipulation void. It is a plain and explicit stipulation of the con-
" tract upon which the minds of the parties met, and is as binding on
" the assured as any stipulation in the policy. When the assured
" sought to have Tucker, the local agent, waive the forfeiture which
" he virtually admitted having taken place by a change of possession
" of the property insured by legal process, he knew that, by the terms
" of his policy, he had no power or authority to waive it, unless it was
" endorsed on the policy in writing. This provision was a clear limit-
" ation and restriction of his power. It was his own fault that he
" failed to have such waiver so indorsed. The courts can not relieve a
" party from the legal consequences of such an omission to abide by
" the plain stipulations of his contract, or make a contract for him
" different from the one made by himself. But this question has
" already been decided by this court in recent cases." (Citing Hen-
derson vs. Hecla Fire Ins. Co., 75 Wis., 196; Hankins vs. Rockford
Ins. Co., 70 Wis., 1).

Carey vs. German Amer. Ins. Co. (Wis.), 20 L. R. A., 267.

\*          \*          \*          \*          \*          \*          \*          \*

"But even if the agent knew the fact of residence within the ex-
" cepted period, he could not waive the forfeiture thus incurred with-
" out authority from the company. The policy declared that he was
" not authorized to waive forfeitures; and to this provision effect must
" be given, except so far as the subsequent acts of the company per-
" mitted it to be disregarded."

\*          \*          \*          \*          \*          \*          \*          \*

"The doctrine of waiver, as asserted against insurance companies, to
" avoid the strict enforcement of conditions contained in their poli-
" cies, is only another name for the doctrine of estoppel. It can only
" be invoked where the conduct of the companies has been such as to
" induce action in reliance upon it, and when it would operate as a
" fraud upon the assured if they were afterwards allowed to disavow
" their conduct and enforce the conditions."

Globe Mut. Life Ins. Com. vs. Wolff, 25 U. S., 326 (24 L. R. A.,
387).

\*          \*          \*          \*          \*          \*          \*          \*

"An insurance company can limit the authority of its agents and " thus bind all parties dealing with them with knowledge of the limita- " tion. A party is presumed to have read his application, and to be " cognizant of the limitations therein expressed. * * * A reten- " tion of the policy, containing a copy of the application, is an " approval of the application by the assured.

"The present case is very different from Insurance Co. vs. Wilkin- " son, 13 Wall., 222, and from Ins Co. vs. Mahone, 21 Wall., 152. In " neither of those cases was any limitation on the power of the agent " brought to the notice of the assured."

N. Y. Life Ins. Co. vs. Fletcher, 117 U. S., 519-530 (29 L. R. A., 934).

In a case decided by the Supreme Court of Georgia, in July, 1899, a typewritten copy of the opinion in which has been furnished us, a clause, identical with that in the policy before us, limiting the authority of the agents of the company, was considered, and it was held that:

"A mere oral permission to the insured, by the agent who issued the " policy, to take out additional insurance, was not binding upon the " company, and did not estop it from setting up as a defense to an " action thereon, that the insured, in violation of the terms and con- " ditions of the policy had, in fact, taken out additional insurance on " property covered by the same."

Lipman vs. Aetna Ins. Co. (Ga.), 9 S. W.

\*    \*    \*    \*    \*    \*    \*    \*

Of the adjudged cases relied on by plaintiff, that of Insurance Co. vs. Wilkinson, is disposed of, in so far as any present application is concerned, by the opinion in Insurance vs. Fletcher, 117 U. S., 519, quoted above. The case of Story vs. Insurance Co., 37 Ann., 255, is equally inapplicable; for there, the court found that the assured dealt with the president of the company, at the office of the company, at a time subsequent to the making of the contract; and, finding, as a fact, that the president "had consented to a waiver, held, that it was the act of the company." In McGurk vs. Metropolitan Life Ins. Co., 1 L. R. A., 563, it appeared that the plaintiff's application for life insur- ance "was filled out in plaintiff's grocery store, by the assistant super- intendent of the company in the district where the assured resided; that this was done in the room where the assured kept liquors, and whilst he was selling them, and that the agent of the company drank

liquor then and there. It further appeared that to the question as to what his business was, the assured answered that he was a grocer, that there was nothing else in the application on the subject, and that, thereafter, a policy of insurance was delivered to him which contained clauses reading as follows, to-wit:

"'The person upon whose life this policy is issued, shall not be con-"nected in any capacity with the ale, wine, or liquor business, unless "so specified in the application heretofore referred to, or unless per-"mission be given by permit signed by the president or secretary. "* * * Agents are not authorized to make, alter, or discharge "contracts, or waive forfeitures, or receive premiums or policies in "arrears after the time allowed by the regulations of the company.'"

It appeared that the policy was delivered to the assured in his place of business, where he was selling liquor, and that he continued to sell liquor, to the knowledge of four different agents of the company, and that he also continued to pay premiums, which were collected by an agent who knew that he was so engaged, and who turned the premiums over to the company.

It was held that the knowledge of the agents, under such circumstances, was the knowledge of the company, and that the receipt of the premiums was a waiver, *by the company*, of the conditions relied on by it.

In the case at bar, the first premium (paid to the agent who issued the policy) was the only one which was paid, and the evidence upon the questions of fact connected with the transaction was totally different from that upon which the case cited was decided.

Our conclusion then, from what has been heretofore said, is that, upon the case as presented, the company might have waived the conditions contained in the "three-fourths value" and "iron safe" clauses, and that this might have been done orally, notwithstanding the stipulation in the policy requiring all waivers to be in writing, and that what the company might have done, must, if done at all, have been done by an officer, agent or representative authorized for that purpose; but that the company did not waive said conditions, and that the agent who is said to have done so on behalf of the company was without authority in the premises, and that the assured knew, or ought to have known, that he was without such authority.

As to the question of fact, or perhaps it may be called a mixed question of law and fact; whether what was done by the agent could

be regarded as a waiver such as is relied on by the plaintiff, even supposing such agent to have been acting with the full authority of the company, the case presents some features worthy of more than usually serious consideration, by reason of their important bearing upon transactions of every day occurrence, many of which can not be brought into this court by appeal.

The claim here is, not that, after making a written contract the defendant, at a subsequent period, by oral agreement waived a condition therein contained in its favor, but that, there being neither fraud nor error in the matter;—synchronously, with the making of the written contract, the parties thereto entered into a verbal contract, whereby they agreed that the written contract did not, or should not, express their true intent and understanding, but should be subordinated, in certain important particulars, to said verbal contract, made and completed at the same instant. But the plaintiff brings his suit upon the written contract, and annexes it to, and makes it a part of, his petition, in which, however, he says:

" * * * That he faithfully, at all times, complied with the terms " and requirements of his policy of insurance, and with the slip or " form thereto attached, the three-fourths value clause and the iron " safe clause of which he denies forms any part of said policy, and " denies reference to application is a warranty."

He desires to have this written contract enforced, therefore, to the extent that it imposes obligations on the defendant, and declared void to the extent that it appears to impose upon him certain obligations, which he selects, for no apparent reason so far as disclosed, there being no allegation or reference in the petition to any verbal contract or waiver whatever, or to any other agreement than that represented by the policy of insurance upon which the suit is brought.

It must be admitted that the theory thus propounded, which is more fully developed by the introduction of the oral evidence, is not one which is likely to commend itself to ordinary, rational business men, and it is not altogether easy to say which of the two contracting parties is placed by it in the more remarkable position. The insurance agent is supposed to have agreed, verbally, that the obligations binding his company in writing shall so bind it hard and fast, and that those which bind the plaintiff, also in writing, shall go for nothing; whilst the plaintiff, although binding himself in writing, is will-

ing to rely upon a contemporaneous verbal agreement for an exemption from the liability thus imposed.

To proceed further, however. In the application for insurance, which is partly printed and partly written, the following question appears, to-wit:

"Will you agree to make a detailed inventory at least once a year? "Will you agree to keep your account books, and last two inventories "in a fire-proof safe, or remove them when your store is not actually "open for business to some secure place, not exposed to a fire which "would destroy the house where your business is carried on, and to "produce such books and inventory in case of loss?"

These questions are answered by the assured in the affirmative.

The policy was filled up, delivered, and accepted, at the same time that the application was signed, the whole being one transaction. The "three-fourths value clause," and the "iron safe clause" are printed upon a separate slip (containing also a description of the property insured), which is attached upon the face of the policy. The description might readily have been entered upon the policy itself, and the entire slip left off; or the two clauses, which are printed in separate paragraphs, might have been cut off, leaving upon the slip only the description of the property and the consent of the company to the sale of oil and gunpowder.

The plaintiff, however, instead of requiring that this should be done, fortified and confirmed his written proposition, evidenced by the application which he had signed, by accepting the policy with these printed conditions thus, *ex industria,* and conspicuously, printed in it, and he now claims exemption from these conditions upon the ground that this written evidence, which he had thus concurred in making, is, in point of fact, false, and that the court should accept, by preference, his statement, flatly contradicted by the other party to the contract, of a contemporaneous oral agreement, whereby the written contract was to be of no effect.

The testimony upon the subject, adduced before the jury, was as follows, to-wit:

Plaintiff says:

"I made the application a few minutes before the policy was issued. "I signed that application. I did not read the application. It was "hastily drawn up; it was in his, the agent's handwriting. He read "the questions to me. He did not inform me that the statements in

" my application were warranties to the company. He did not tell me
" that any wrong statement therein would work a forfeiture of all
" claims against the company. He knew at the time he issued that
" policy that I had no iron safe in the store. I told him so at the time.
" I told him so on account of this slip being attached to this policy
" and he asked me the question, too, if I had the safe in the store.
" When I called his attention to the slip attached to the policy, he said
" that it cut no figure with the policy, that it was only a matter of
" form."

"Mr. Lacombe read the questions to me, and I answered some of
" them. Some of them I did not answer. * * . * I do not remem-
" ber what questions I did not answer, * * * after that applica-
" tion was answered, Mr. Lacombe did fill up and hand me the policy
" * * * with the slip attached, just as it stands, but he told me
" that the three-fourths value clause and the iron safe clause attached
" did not affect the policy. I received the policy and retained it in my
" possession until after the fire when I sent it to my attorney.

\* \* \* \* \* \* \* \*

"I did not read the policy, only the slip attached. What attracted
" my attention about the slip was the iron safe clause. * * * If
" Mr. Lacombe had not told me that the iron safe clause cut no figure,
" I would have complied with it."

He also testified that an inventory, which had been taken shortly
before the insurance was effected, was found by him, after the fire, at
his residence, and that he kept the policy at his residence, but that his
books were left in the store, and were burned. He further says that he
paid the premium three or four days after the policy was issued, and
that it was tendered back to him a few days after the fire, by Mr.
Lacombe (quoting the language): "He offered it to me as the rep-
" resentative of the company, and advised me as a friend, not to
" accept it, and stated he was going to New Orleans that night, and
" would try to have the matter adjusted."

The evidence shows that the stock of goods in question had been
purchased by plaintiff from Mrs. Marshall Compton, that but a por-
tion of the purchase price had been paid, and that plaintiff has
authorized his attorney to pay over to Mrs. Compton eighty per cent.
of any amount which he may recover in this suit.

Under these circumstances, Mrs. Compton's husband is hardly within the spirit of the law regulating the competency of witnesses. However, he has testified as follows:

"Mr. Lacombe told me he knew Murphy had no iron safe when he "issued the policy sued on. * * * I heard Lacombe say to "Murphy: 'As the representative of the Royal Insurance Co., I ten- "der you this $60, but as your friend, I advise you not to take it.' He "told Murphy he thought that he would get his money."

He also testified that the stock of goods was sold to Murphy for $2,485, and that $500 of the amount had been paid.

Upon the other hand, Lacombe, for the defendant, gives the following testimony. Speaking of the application, he says:

"The answers to the questions are in my handwriting. They were "written down by me in response to the questions propounded to Mr. "Murphy. After the answers were written down, he signed the ap- "plication. * * * All of these answers are written down just as "they were given me by Mr. Murphy."

He then explains that the answer in regard to "incendiarism is "incorrectly written, as is apparent."

  *       *       *       *    ·    *       *       *       *

"Witness examines question headed 'inventory,' and says: 'That "question was explained to Mr. Murphy at the time. I explained it to "Mr. Murphy by asking him if he would take an exact inventory at "least once a year; he answered 'yes.' I said, will you agree to keep "your account books and last two inventories in a fire-proof safe or "remove them when your store is not actually open for business to "some secure place not exposed to fire which would destroy the house "where your business was carried on, and to produce such books and "inventories in case of loss?"

"Mr. Murphy advised me that he had no iron safe, and that he "would remove his books to his place of lodging, nightly, after his "place of business was closed. I advised him that it was not neces- "sary for the safe, if he would sign an application agreeing to remove "his books to a place of safety after business was closed, and to pro- "duce said books in case of loss by fire, and he agreed as per his sig- "nature attached to his application. I would not have issued the "policy, nor would the company have accepted the insurance, had not "this application with his signature thereto attached accompanied the "daily report to the company, showing the amount that I had bound

" them for.   *   *   *   That was the only time I had occasion to
" explain to Mr. Murphy about the meaning of the iron safe clause—
" it was at that time and not when I handed him the policy.   I never
" did, at any time, say to Mr. Murphy that the 'iron safe clause' and
" the 'three-fourths value clause' attached to this policy were mere
" forms.   I explained to Mr. Murphy about the 'three-fourths value
" clause' and the 'iron safe clause' before he signed the application.
" He stated he would like to have a policy for $2,000.   I told him that
" in order to secure $2,000 insurance, his stock would necessarily have
" to be worth about $3,000.   He advised me to make a memorandum to
" that effect upon his application to the company; that 'after Feb-
" ruary, 1897, assured would keep about three thousand dollars average
" stock,' which I inserted upon the application above his signature."

(This statement is borne out by his application which is before us
in the original).

It may be remarked here that the insurance was solicited by the
assured and not by the insurer.

Mr. Alexander, a witness for the defendant, testified that he was an
agent of the company, that he went with Major Hereford, the special
agent and adjuster for Louisiana and Texas, to see Mr. Murphy about
his loss.

"Mr. Murphy (said the witness) told Major Hereford he bought it,"
" (the stock) from Mrs. J. J. Compton, paying her $2,400, cash, and
" he then asked him if he had taken an inventory, he replied that he
" had; he then said, Mr. Murphy, if you will bring your books and
" your inventory to the hotel, I will there take up the loss," Mr.
Murphy replied, that "he had no books or inventory and that they had
" all been destroyed in the fire.   Major Hereford then asked him to
" show him the policy—opening it and showing Mr. Murphy the 'iron
" safe clause,' told him that he was very sorry, but that he could not
" do anything for him as the policy was void, that the company did
" not owe him a cent, and that he would instruct Mr. Lacombe to
" return him the premium.   Mr. Murphy said 'do you mean that you
" are not going to pay me anything?' Major Hereford told him that he
" was powerless to act; that, the provisions of his policy being violated,
" vitiated the contract; that he should have kept his books out of the
" store.   Mr. Murphy told him that he had always done so up until the
" night of the fire, and explained to him, particularly, why he had
" happened to leave them there that particular night, that he had been

" checking over some invoices and had become tired, and left the
" books lying on the counter. * * * My recollection as to what
" occurred on this occasion is clear and positive. Major Hereford is
" dead, he died some time in 1896."

The plaintiff admits that Major Hereford called on him and that
Mr. Alexander was present at their conversation, of which he gives
the following version, to-wit:

"Major Hereford asked me for the policy and for the books and I
" gave him the policy, and told him that the books were burned. He
" asked me if I had a safe and I told him that I did not. He asked
" me, then, what I considered the value of the policy and I told him
" that I valued it at its face value, $2,000. He folded it up, then
" handed it to me and said that it was void. I told him that I would
" have it investigated."

This is about all the testimony, material to the point at issue, that
was given in the case.

It will be observed that it is placed beyond all question that the
plaintiff signed the application knowing that the "iron safe clause"
was embodied in it, and that he accepted the policy knowing that the
clause was incorporated in it. He and Lecombe concur, that it was
understood between them that he had no iron safe, and whilst Lecombe
testifies, specifically and circumstantially, that he told the plaintiff
that he could comply with the condition in question by removing his
books to a safe place, when his store was closed, and by agreeing to
produce them in case of a loss, and that the plaintiff agreed to do so,
and signed his application with that understanding, which was in
entire conformity with the conditions as written, the plaintiff is pro-
foundly silent on that subject.

It will also be observed that, whilst Mr. Alexander testifies to a con-
versation between the plaintiff and Major Hereford, in which the
former stated that he had always taken his books home at night, the
plaintiff, giving his version of that conversation, relates only so much
of it as refers to his having had no iron safe (which was understood
from the beginning), and makes no mention of anything said about
the alternative obligation of removing his books. He is not, however,
put on the stand to deny the truth of the testimony given by Alex-
ander.

The Court of Appeal, though considering the evidence, as to the
fact of the waiver "conflicting and contradictory," was, nevertheless,

unwilling to disturb the verdict on that point, but increased the amount allowed by the jury, from $1,000 to $1,863, which latter sum we understand to be the amount fixed by the court, upon the evidence in the record, as equaling three-fourths of the plaintiff's loss, thus giving effect to the "three-fourths value clause," which the plaintiff claims to have been waived in the same manner that the iron safe clause was waived.

Our investigation leads us to a different conclusion. To us, the error of the jury, in finding that there was a waiver of either condition, by any one authorized, or pretending to be authorized, to that effect, is as manifest as the error as to the amount, and we think that the proof falls as far short with respect to the waiver of the "iron safe clause" as with respect to the waiver of the "three-fourths value clause."

It is proper to say, in conclusion of this opinion, which has been thus extended on account of the importance of, and wide-spread interest in the question at issue, that whilst this court, exercising the jurisdiction conferred by Article 101 of the Constitution, will not undertake to review, either as to law or fact, all cases which may be decided by the other courts of the State, since, if that had been the intention of the framers of the Constitution, all cases would have been placed upon the basis of those in which appeals are allowed, nevertheless, the jurisdiction thus conferred must, and will be, exercised in any proper case, whether the issue be one of law or fact, or both; the question as to what constitutes a proper case necessarily depending upon varied circumstances and requiring the exercise of a sound discretion.

*In re.* Ingersoll, praying, etc., 50th Ann., 748; West vs. Mrs. De Moss and Husband, 50th Ann., 1349; Brown Shoe Co. vs. Mill & Bro., 51 Ann., 920; Monroe Mercantile Co. vs. Elder, 51 Ann., 1773; Mrs. Irene Davenport, Tutrix, vs. Adler & Co. (this day decided).

For these reasons, it is ordered, adjudged and decreed that the writs herein issued be maintained, that the judgment herein rendered by the Court of Appeal for the Third Circuit be annulled, avoided and reversed, as also the verdict and judgment rendered in, and by, the District Court for the Parish of Rapides, and it is further ordered, adjudged and decreed that there now be judgment in favor of the defendant, the Royal Insurance Company, and against the plaintiff, J. N. Murphy, rejecting the demand of the latter, and dismissing his suit with costs in all courts.

Rehearing refused.