## MAJESTIC CAFÉ v. MONOGRAM COFFEE CO., Inc., et al.

### No. 4776.

Court of Appeal of Louisiana. Second Circuit.

March 3, 1934.

L. A. Newsom, of Shreveport, for appellant.

Jackson & Smith and C. L. Mayer, all of Shreveport, for appellees.

TALIAFERRO, Judge.

The plaintiff conducts a restaurant in the principal business section of the city of Shreveport, and for many years has served to its customers coffee made from special blends of that product confected by the Monogram Coffee Company, and its grantor, while under the management of one J. C. Abel, Sr. Abel appears to have been specially skilled in the blending and roasting of the brands of coffee sold under the trade-name, "Monogram Coffee," and built up an extensive demand for these products.

In March, 1930, plaintiff conceived the idea of affixing over the front entrance of its café building, above the sidewalk, a neon electric sign carrying the café's name and a certain brand of ham sold by it, and one of its members approached Mr. Abel about having the words "Monogram Coffee" placed thereon, with the obligation of paying a fixed part of the cost of the entire sign. This was agreed to, and on March 10th Abel, on behalf of the Monogram Coffee Company, in confirmation of their oral agreement, wrote plaintiff that his company would pay $20 per month on the sign for a period of thirty-six months. The sign was then purchased and duly installed, as agreed. The monthly payments were made by the company for twelve consecutive months. Some friction arose between Abel and the company's owners, and he resigned. This was in April, 1931. Plaintiff at that time discontinued the purchase of coffee from the company because the sort of coffee prepared by Abel was no longer sold by it. The thirteenth payment on the sign was made about this time, and the company repudiated its contract with plaintiff, disclaiming any further liability thereunder.

The Monogram Coffee Company was a co-partnership, owned and composed of stockholders of the Frank Grocery Company, Inc. Its business was carried on in the same building that housed the parent company's business. This suit was instituted by plaintiff against the Monogram Coffee Company, Inc., which had taken over the assets and assumed the liabilities of the Monogram Coffee Company, and against the Frank Grocery Company, Inc., to recover the alleged balance due on the contract above mentioned.

Plaintiff alleges that, as a consideration for the advertisement of Monogram coffee on said electric sign, the Monogram Coffee Company agreed to make the payments mentioned in its contract with it; that in keeping with said agreement and contract plaintiff purchased said sign, after the design thereon had been approved by said Monogram

**38**

Coffee Company; and that in all other respects it had complied with its obligations under the contract.

Defendants, after pleading a general denial, aver that the payments made by them on said contract were made in return for plaintiff displaying a sign indicating to the public that it used and served Monogram coffee and for plaintiff so using and serving such coffee to the public.

They further plead that if J. C. Abel entered into such agreement as alleged upon by plaintiff, he did so without the authorization or knowledge of defendants; that prior to March, 1930, plaintiff had been purchasing fifteen pounds of Monogram coffee daily from defendants, and had been serving said coffee to the public in its place of business, and that because of these facts they authorized said J. C. Abel to contribute $20 per month to plaintiff to assist in advertising such coffee and to inform the public of the fact that such coffee was being served in plaintiff's café; that on or before June 1, 1931, plaintiff discontinued the use of said coffee and since that time has neither purchased from defendants nor served in its café any of the said Monogram coffee, but has served other brands.

Defendants further plead that they have duly registered the trade-name "Monogram Coffee" as required by the laws of Louisiana (Act No. 49 of 1898), and it is now their property subject to their exclusive right to use and to control the use thereof; that the use of said trade-name by plaintiff upon its sign is misleading and a fraud upon defendants and the public in that by displaying said sign plaintiff represents and indicates to the public that Monogram coffee is being served in its café, which is untrue; that plaintiff has been repeatedly requested to discontinue use of said trade-name upon its sign and warned that its continued use was misleading and likely to cause injury to defendants; and, lastly, in the alternative, they plead that should it be held that Abel had authority to bind defendants on the contract sued on, then they show that for the reasons set forth in their answer said contract could not bind either of the parties thereto after June 1, 1931, and, for said reasons, the enforcement of said contract against defendants after that date is contrary to public policy.

Plaintiff's suit was dismissed by the lower court, and this appeal is prosecuted by it.

Before Abel closed with plaintiff the contract sued on, he discussed it with Mr. R. F. Brabstone, who was in full charge of the Frank Grocery Company as manager and treasurer, and also was over Abel in the management and operation of the coffee company. Abel says the reason he mentioned the matter to Brabstone was because his authority to sign advertising contracts had been questioned by a bank in Mansfield, La., and further because this was a long-term contract. He says Brabstone asked him if he thought it worth the expense, and Abel, answering in the affirmative, was authorized to go ahead and sign it. He further states that when the sign was installed he and Brabstone together went to the café and looked at it. In his opinion the advertising value of the sign was worth more than the amount his company agreed to pay on it. He also states that plaintiff did not, in connection with this contract, obligate itself to continue to buy or use Monogram coffee; that the only purpose in having the words "Monogram Coffee" on the sign was to advertise the coffee. Mr. J. H. Dehan, member of plaintiff firm, corroborated the testimony of Abel in regard to the motive for having the coffee advertisement on the sign, and further states that he only ceased purchasing coffee from defendants, after Abel left there, because he could not get the kind Abel had been making and selling to his company.

Mr. Brabstone admits that Abel conferred with him about the advertisement on the sign, and says that Abel asked him if plaintiff's business justified giving $20 per month to help pay for the sign, to which Brabstone replied in the affirmative. He says he "authorized the monthly allowance in return for the business they gave us." He says he knew nothing of the written contract sued on until this suit was filed, and is positive he did not authorize Abel to sign a contract obligating his principal for thirty-six months; that the matter was discussed as being on a monthly basis and the payments were in the nature of a rebate in order to hold the business. He admits that he signed checks for the coffee company for all the payments made on the contract with plaintiff, thirteen in all, and that the last one was issued by him after Abel left his company's employ.

The testimony of Brabstone and Abel is at variance in two important respects as regards the reason for the company becoming interested in the sign proposed by plaintiff and the extent of the company's pecuniary obligation in connection therewith; Abel says it was an advertising scheme, purely and simply, while Brabstone says it was agreed to by his company only on account of and to hold the plaintiff's patronage; and Abel says that Brabstone knew the contract was to

cover thirty-six months, while Brabstone denies this.

The testimony of Abel and Brabstone is very much at variance as to the extent of Abel's authority to bind his employer by contract appertaining to its business. Brabstone was uninformed in the coffee business. Abel's experience in buying, roasting, and marketing coffee extended over many years, and his own testimony and that of his son, supported by the circumstances of the case, convince us that he had almost plenary power in the conduct of defendants' coffee business, and was vested with authority to perform any act that was designed to promote its business and increase its patronage. Abel was not an ordinary employee. In addition to being paid a very substantial salary, he shared in the profits of the coffee company to the extent of one-fourth thereof. He had more than an ordinary interest in the success of the company's business. It is probably true that because plaintiff was a liberal user of Monogram coffee that fact had some influence in the getting together of the parties, but that was not the only, nor the main, motive that prompted them.

It is certain, plaintiff, acting on the faith of the contract signed by Abel for defendant, closed a contract with the neon sign people to install the sign at a cost of nearly $1,300.

It may also be true that Mr. Brabstone reasoned that by making a contribution on the price of the sign that plaintiff's patronage would thereby be more certainly secured to his company, but at that time there was no circumstance to indicate in the least that plaintiff did not intend to continue buying and serving Monogram coffee as it had been doing for seven years or more. We have no doubt that had Abel remained with defendants for thirty-six months after the contract was made that plaintiff would have, during that time, continued its patronage to defendant and that defendant in turn would have regularly paid the monthly installments as they fell due. It was not plaintiff's fault that it quit buying coffee from defendant. It had featured this particular brand of coffee in its café business for many years and was not willing to shift to other brands which were, perhaps, not satisfactory to its patrons.

It is true that, as argued by defendants, one who deals with an agent is bound to look to the extent of the agent's powers. If he does not do this, he acts at his own risk and peril. We do not think, however, this rule finds application in this case for several outstanding reasons. Brabstone author-

ized, if such authority were necessary, Abel to make the contract with plaintiff to advertise his company's coffee on the electric sign, and Abel certainly had apparent, if not definite, authority to fix the details of the contract. The fact that Brabstone, for his company, paid, without question and without investigating the terms of the contract, twelve installments thereon, is persuasive of the inference that he knew, or ought to have known, that the contract embodied a long term for its final discharge. In this connection, it is shown that Abel had previously made contracts on his own motion for the advertisement of the defendants' coffee, which were not questioned by them, and this, too, at places at which this coffee was not used or sold. Plaintiff, over the many years it had had business dealings with the Monogram Coffee Company, knew no one in such dealings but Mr. Abel. To plaintiff he was the person vested with full authority to act for the company. Certainly his authority to advertise its products was apparent, if not specially and definitely authorized. If so, his contracts within the limits of such authority are binding on his principal. Admittedly he was acting within the scope of his authority. Clasp Envelope Co. v. Trusilk Co., 5 La. App. 658; Farrar v. Duncan, 29 La. Ann. 126; Chaffe v. Barataria Canning Co., 113 La. 215, 36 So. 943; Johnson v. Manget Bros. Co., 168 La. 317, 122 So. 51.

Commenting upon this legal principle, 2 Corpus Juris, 566, correctly states the rule to be: "In legal significance an agent's authority is the sum total of the powers which his principal has caused or permitted him to seem to possess. It is not limited to the powers actually conferred and those to be implied as flowing therefrom, but includes as well the apparent powers which the principal by reason of his acts or conduct is estopped to deny."

This same authority, on same subject, pages 570–573, says: "While as between the principal and the agent the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof; and as between the principal and third persons the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal holds the agent out as possessing or which he permits the agent to represent that he possesses and which the principal is estopped to deny, and the prin-

cipal will be bound by all acts of the agent performed in the usual and customary·mode of doing the particular business, although he may have acted in violation of private instructions, unless there is something· in the nature of the business or the circumstances of the case to indicate that the agent is acting under special instructions or limited powers. This rule applies whether the agency is a general or special one."

The rule is also clearly and elaborately laid down in Murphy v. Royal Insurance Co., 52 La. Ann. 775, 27 So. 143, 146. The facts of that case are not similar to those of the case .at bar, but the principle involved and discussed at length is the same. The court there made use of this language:

"The authority of an agent must be determined by the nature of his business, and is, prima facie, co-extensive with its requirements. * * *

"The rule is not a doubtful one, either in policy or principle, that in transactions of this character, where one of two persons must sustain a loss, the loss must fall upon him who has made it possible for the other, innocently, to be placed in a position where loss might result to him except for the application of this rule. It would be disastrous to commercial as well as to other interests if a person, by acting through the agency of another, could shield himself from liability for such person's acts, ad libitum. Fortunately no such rule exists, *and he who intrusts authority to another, in whatever department of business, is bound by all that is done by his agent within the scope of his apparent power, and cannot screen himself from the consequences thereof upon the ground that no authority in fact was given him to do the particular act, unless the act was clearly in excess of his apparent authority, or was done under such circumstances as to put the person dealing with him upon his inquiry as to the real authority of the agent.*"

Therefore, whatever else may be said of Abel's authority in connection with the contract in question, after being authorized to execute it in its substantial aspects, he. cer-

tainly had apparent authority to obligate his principals as to its details, and plaintiff· acted within its legal rights when dealing with him on this basis, and under the assumption that his power was complete.

■ Defendants' counsel, in consonance with the alternative defense, earnestly argue that since plaintiff, on or about June 1, 1931, ceased to serve Monogram coffee at its café, the advertisement of such coffee on its sign is misleading to the public and operates a fraud upon it and defendants, and therefore, because in violation of and against public policy, the contract, from and after that date, is null and void and cannot be enforced as to either party. This defense is not tenable. It is probably true that this sign will mislead some people who wish to drink Monogram coffee, and it is likely defendants, since the trade-name has been registered as authorized by law, have the legal right to prohibit plaintiff from continuing the display of it on its sign, since it does not serve this particular coffee to its patrons, yet none of this can affect the legal rights of the parties, as originally fixed in the contract.

If, as contended for by plaintiff, the sign was simply to advertise Monogram coffee, its obligation under the contract has been fully discharged. If the position of defendants is correct that payments were to be made on the sign only while plaintiff was buying and serving Monogram coffee at its café, then we say that defendants and their agent Abel have made it impossible for plaintiff to comply with that version of the contract because defendants cannot longer deliver to plaintiff the coffee in question.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and there is now judgment in favor of the plaintiff, Majestic Café, and against defendants, Frank Grocery Company, Incorporated, and Monogram Coffee Company, Incorporated, in solido, for $460, with 5 per cent. per annum interest on $420 thereof from judicial demand herein until paid, and like interest on $20 thereof from March 21, 1933, and like interest on $20 thereof from April 21, 1933, until paid, and costs of suit.